# EXHIBIT 4



STATE OF NEVADA
OFFICE OF THE ATTORNEY GENERAL
PUBLIC INTEGRITY UNIT
555 E. Washington Street, Suite 3900, Las Vegas, NV 89101
Telephone: (702) 486-3420 / Fax: (702) 486-3768

# NEVADA PUBLIC INTEGRITY UNIT
# SOUTHERN NEVADA
# COMPLAINT FORM

Thank you for completing this Complaint Form.  Upon receipt of your complaint, a staff member will review your complaint.  This process can be lengthy.  Depending on the circumstances and the information you are able to provide with your complaint, it may take from two to twelve weeks for you to get a response

**INSTRUCTIONS:  Please type or print your complaint in ink and complete the form fully.**

## SECTION 1: COMPLAINANT'S INFORMATION

Your Name:    <u>Don</u>     <u>Karl</u>     <u>Juravin</u>
              (First)         (Middle)       (Last)

Your Address:    <u>PO Box 5939</u>    <u>Sarasota</u>     <u>FL</u>    <u>34227</u>
              (Street / PO Box)      (City)        (State)      (ZIP Code)

Home Telephone: _____     Cellular Telephone:   <u>850-773-8850</u>

Work Telephone: _____

E-Mail Address:   <u>DonK@Juravin.com</u>

## SECTION 2: PUBLIC OFFICIAL'S INFORMATION (To Whom Your Complaint Is Against)

Official's Name:    <u>Justin Jones</u>        Title:   <u>Senator</u>

Official's Government
Agency or Body:     <u>State Senate - District 9</u>

Official's Work Address:   <u>PO Box 371626</u>   <u>Las Vegas</u>    <u>NV</u>    <u>89137-1626</u>
                     (Street / PO Box)     (City)      (State)    (ZIP Code)

Official's Telephone:    <u>702-518-4511</u>

# NEVADA PUBLIC INTEGRITY UNIT
## COMPLAINT FORM

**SECTION 3: Please detail the nature of your complaint against the above named public official. Include the "who, what, when, why, and where" of your complaint.** <u>**BE SPECIFIC!**</u> **You may use additional sheets if necessary.**

My complaint is:   <u>See Section 3 Attached</u>

_____

_____

_____

_____

_____

_____

**SECTION 4: List and attach photocopies (no originals) of any relevant documents that support your complaint.** Copy both sides of any documents that pertain to this complaint.

A:   A. Blog of Mr. Randazza describing meeting with Senator Jones     B. Donation record of

B.   Mr. Randazza to Senator Jones  C. Fundraising dinner by Randazza for Jones

C.   D. Fundraising efforts on social media by Mr. Randazza for Senator Jones

D.   E. Minutes of legislative session

F. Tweet by Senator Jones promoting Mr. Randazza article

**SECTION 5: Sign and date this form.   Nevada's Public Integrity Unit cannot process any unsigned, incomplete, or illegible complaints.**

I understand that the Attorney General is **not my private attorney**, but rather represents the public by enforcing laws prohibiting certain types of misconduct by public officials.  I am filing this complaint to notify Nevada's Public Integrity Unit of a public official's possible misconduct.  I understand that the information contained in this complaint may be used to establish violations of Nevada's Public Integrity laws.  I understand that this complaint to Nevada's Public Integrity Unit is subject to disclosure under Nevada's Public Records Law.

I certify under penalty of perjury that the information provided on this form is true and correct to the best of my knowledge.

_____          _____
(Signature)                                              (Printed Name)
*OCT. 13. 2014*            *DON KARL JORAWN*
_____
(Date)

_____          _____
(Signature)                                              (Printed Name)

_____
(Date)

Rev: July 16, 2009

**SECTION 3**

October 13, 2014

Complaint of Don Karl Juravin against Senator Justin Jones

This complaint is regarding Senator Justin Jones (District 9), whom I believe may have accepted a bribe for the introduction and passage of Senate Bill 286 (Nevada's Anti-SLAPP law). I recently learned that Nevada Attorney Marc Randazza may have promised Senator Jones campaign contributions in exchange for sponsoring and passing the law.  If true, this may be a violation of Nevada Revised Statutes (NRS) Chapter 197.

On October 6, 2014 Mr. Randazza published a blog post which could be construed as an admission that he bribed Senator Justin Jones.  In the blog he wrote:

> Two years ago, my partner, Ron Green, introduced me to a guy. That guy's name was Justin Jones. Justin was running for State Senate in Nevada. … I shook his hand and said "if you will sponsor an Anti-SLAPP bill, I'll vote for you, and I'll contribute to your campaign." He promised me that he would do so.  Within days of taking office, he made good on his promise.  (*See* Attachment A Printout of Blog)

I believe that this is an admission of bribing a public official under NRS 197.010 and 197.020 as Mr. Randazza promised to reward the Senator with votes and campaign contributions with the intent to influence the Senator with respect to Senate Bill 286.  Senator Jones may have violated NRS 197.1030 and 1040 when he received a promise of a campaign contribution for sponsorship of Senate Bill 286.  As detailed in Attachment B, Mr. Randazza did in fact contribute to Senator Jones election fund.

In addition to making personal donations, Mr. Randazza is hosting a dinner for Mr. Jones where the recommended minimum donation is $250 (*See* Attachment C)  Mr. Randazza is also actively trying to raise money for Senator Jones via social media (*See* Attachment D).

According to public records, the two individuals are intertwined in what appears to be a *quid pro quo* relationship. On May 6, 2013 Senator Jones and Mr. Randazza appeared together at the assembly of the Committee of the Judiciary about than Senate Bill 286 to ensure the passage of the Anti-SLAPP law (*See* Attachment E).  Mr. Randazza is a proponent of an Anti-SLAPP law and he has brought numerous SLAPP lawsuits and generated tens of thousands of dollars in revenue for himself and his law firm.  A stronger Nevada Anti-SLAPP law means more money for Randazza. It appears that Senator Jones only became interested in the SLAPP law because of the campaign contribution promise by Mr. Randazza  There is no mention of the Anti-SLAPP law on his website and I could not find any record of this being a concern to him or his constituents before he met Randazza.  The only mention I could find of Mr. Jones and SLAPP was an October 15, 2013 tweet by Senator Jones promoting an article written by Marc Randazza (*See* Attachment F). It appears that Senator Jones is only concerned about SLAPP laws because of his relationship with Mr.

Randazza and his promise of funds and votes.

Given the backgrounds of Senator Jones and Mr. Randazza, it is extremely perplexing that the two have teamed up on this issue.  Senator Jones is a conservative Mormon who supports family values.  Mr. Randazza is a porn attorney and a speech advocate for pedophiles whose client list includes Phillip Greaves author of "The Pedophile's Guide", Kink.com, Bang Bus and Milf Hunter.  I trust that this nefarious relationship and the apparently admitted bribe will be investigated.

# Exhibit A

A.  1) http://randazza.wordpress.com/2014/10/06/support-an-anti-slapp-hero/



randazza.wordpress.com/2014/10/06/support-an-anti-slapp-hero/

## The Legal Satyricon
Occasionally irreverent thoughts on law, liberty, tech, and politics

| Home | Contact | The Satyriconistas | The Editor | Media |

### Support an Anti-SLAPP Hero

Two years ago, my partner, Ron Green, introduced me to a guy. That guy's name was Justin Jones.

Justin was running for State Senate in Nevada. He's a Mormon. He's sort of conservative. He and I are not what you would call natural bedfellows.

But I shook his hand and said "if you will sponsor an Anti-SLAPP bill, I'll vote for you, and I'll contribute to your campaign." He promised me that he would do so.

Within days of taking office, he made good on his promise. Today, Nevada has the strongest Anti-SLAPP law in the country.

And today, Senator Jones has a tough re-election battle ahead of him. His opponent is an idiot. In fact, she's an empty sack. She won't give interviews, won't debate, and won't wage a serious campaign. Why not? Because she's a puppet.

She's a puppet of organizations that could give half a damn about free speech.

But, she's a well-financed empty puppet.

If Jones loses this election, think of what that means for Anti-SLAPP legislation nationwide. Yeah... he stood up for you, and when it came time to give a shit, you said "meh, fuck it, *I don't want to get involved.*"

Get involved. Whip out your damned credit card, and make a donation. Show legislators nationwide that if they stand up for free speech and sponsor Anti-SLAPP legislation, they'll get support from all over.

Got your credit card? Got that CVV number handy?

Then click here.

Justin and I do not see eye to eye on everything. But, we see eye to eye on the **most important thing**. And, if you're one of my readers, I presume that you agree — without free speech, our other rights are meaningless.

And now, its time for you to show other legislators that if they stand up for that right, it comes with respect from people nationwide. It comes with the respect of people who will actually DO SOMETHING. Do it. Whip it out. Make a donation. If you do not, those who are against Anti-SLAPP legislation in your state will be able to say "hey, the guy who sponsored this in Nevada? He's out on his ass now."

You want that?

### SUBSCRIBE / TERMS OF USE

Subscribe to the Legal Satyricon

✉ By Email

📶 By RSS Feed

Become a fan on Facebook

Follow me on Twitter

**You must read this prior to any use of this site whatsoever.**
**Terms & Conditions of Use and Legal Information** (last updated August 4, 2009)

[          ] Search

### Recent Posts

○ The Ellora's Cave case
○ How to cite to Walter Sobchak
○ Support Legislators Who Supported You
○ Pedo Privacy is Important Too
○ Support an Anti-SLAPP Hero

### TOP POSTS

○ The Ellora's Cave case
○ How to cite to Walter Sobchak
○ Why is Prostitution Illegal, but Pornography is Not?
○ This is COLUMBUS DAY!!!
○ Littering And....

### RECENT COMMENTS

○ John on How to cite to Walter Sobchak
○ azteclady on The Ellora's Cave case
○ Kia Kamran on How to cite to Walter Sobchak
○ the Revision Division on How to cite to Walter Sobchak

A.  2) http://randazza.wordpress.com/2014/10/06/support-an-anti-slapp-hero/#comment-80360



Full Page:



# Exhibit B

Contributions from 'Marc Randazza'

| Contribution Date | File Date | Contribution Amount | Contribution Type | Recipient | Report |
|---|---|---|---|---|---|
| 5/13/2014 | 5/20/2014 | $500.00 | Monetary Contribution | Justin C Jones | 2014 CE Report 1 (Amended) |

Exhibit C

https://act.myngp.com/Forms/-8616503899903949056



Exhibit D

D. 1)

http://randazza.wordpress.com/2014/10/10/support-legislators-who-supported-you/



D.  2)

https://twitter.com/marcorandazza/status/519281842881449984



Full Page:



**MINUTES OF THE MEETING
OF THE
ASSEMBLY COMMITTEE ON JUDICIARY**

**Seventy-Seventh Session
May 6, 2013**

The Committee on Judiciary was called to order by Chairman Jason Frierson at 8:19 a.m. on Monday, May 6, 2013, in Room 3138 of the Legislative Building, 401 South Carson Street, Carson City, Nevada. The meeting was videoconferenced to Room 4401 of the Grant Sawyer State Office Building, 555 East Washington Avenue, Las Vegas, Nevada. Copies of the minutes, including the Agenda (Exhibit A), the Attendance Roster (Exhibit B), and other substantive exhibits, are available and on file in the Research Library of the Legislative Counsel Bureau and on the Nevada Legislature's website at nelis.leg.state.nv.us/77th2013. In addition, copies of the audio record may be purchased through the Legislative Counsel Bureau's Publications Office (email: publications@lcb.state.nv.us; telephone: 775-684-6835).

<u>**COMMITTEE MEMBERS PRESENT**</u>:

      Assemblyman Jason Frierson, Chairman
      Assemblyman James Ohrenschall, Vice Chairman
      Assemblyman Richard Carrillo
      Assemblywoman Lesley E. Cohen
      Assemblywoman Olivia Diaz
      Assemblywoman Marilyn Dondero Loop
      Assemblywoman Michele Fiore
      Assemblyman Ira Hansen
      Assemblyman Andrew Martin
      Assemblywoman Ellen B. Spiegel
      Assemblyman Tyrone Thompson
      Assemblyman Jim Wheeler

<u>**COMMITTEE MEMBERS ABSENT**</u>:

      Assemblyman Wesley Duncan (excused)

<u>**GUEST LEGISLATORS PRESENT**</u>:

      Senator Justin C. Jones, Clark County Senatorial District No. 9
      Senator Tick Segerblom, Clark County Senatorial District No. 3

Minutes ID: 1059



Assembly Committee on Judiciary
May 6, 2013
Page 2

**STAFF MEMBERS PRESENT**:

      Dave Ziegler, Committee Policy Analyst
      Brad Wilkinson, Committee Counsel
      Linda Whimple, Committee Secretary
      Colter Thomas, Committee Assistant

**OTHERS PRESENT**:

      Marc J. Randazza, Attorney, Randazza Legal Group
      James McGibney, CEO, ViaView, Inc.
      Wayne Carlson, Executive Director, Public Agency Risk Management Services, Inc.
      Scott W. Anderson, Deputy for Commercial Recordings, Office of the Secretary of State
      Scott Scherer, representing the Nevada Registered Agent Association
      Robert C. Kim, representing the State Bar of Nevada
      Peter C. Neumann, Private Citizen, Reno, Nevada
      Robert T. Eglet, Private Citizen, Las Vegas, Nevada
      Stephanie H. Allen, representing the Nevada District Judges Association
      Chris Frey, Deputy Public Defender, Washoe County Public Defender's Office
      Patterson Cashill, representing the Nevada Justice Association

**Chairman Frierson:**
[Roll was called.  Protocol was explained.]  Good morning, everyone.  Welcome back to the Assembly Committee on Judiciary.   We have four bills on the agenda for today, and I see Senator Jones here.  I will open the hearing on Senate Bill 286 (1st Reprint) and accommodate you, and then we will get back on track.

**Senate Bill 286 (1st Reprint):  Provides immunity from civil action under certain circumstances. (BDR 3-675)**

**Senator Justin C. Jones, Clark County Senatorial District No. 9:**
As guaranteed by the First Amendment, the right to petition our government for redress is one of the most important rights we have.  Nevada recognizes this right and protects people who exercise their First Amendment right to petition. Specifically, Chapter 41 of the *Nevada Revised Statutes* (NRS) protects people from civil liability for claims based on protected communication.   Generally speaking, protected communications must be made in good faith and be truthful, or at least made without knowing it is false.  The provisions of NRS Chapter 41 are meant to deter frivolous lawsuits, commonly known as

Assembly Committee on Judiciary
May 6, 2013
Page 3

strategic lawsuits against public participation (SLAPP).  A SLAPP is a meritless lawsuit that a plaintiff initiates primarily to stop someone from exercising his First Amendment rights.  When a plaintiff files a SLAPP, NRS Chapter 41 allows the defendant to file a special motion to dismiss the lawsuit.  If the court grants the special motion, it must also award attorney's fees to the defendant. The defendant may also file a new lawsuit for compensatory damages, punitive damages, and attorney's fees and costs for bringing the new lawsuit.

In a recent decision, the Ninth Circuit Court of Appeals held that Nevada's anti-SLAPP provisions under NRS Chapter 41 only protect communications made directly to a governmental agency.  The Court also held that Nevada provisions only protect defendants from liability, not from trial.  Finally, the Ninth Circuit Court of Appeals concluded that in Nevada there is no right to immediate appeal, an order denying a special motion to dismiss a SLAPP.

I am introducing <u>Senate Bill 286 (1st Reprint)</u> to resolve these limitations. Beginning with section 1, the bill expands the type of protected communication to include the right to free speech if it is about an issue of public concern. Section 1 also protects communications about an issue of public interest made in public places.  Section 2 expands the anti-SLAPP provisions to cover any civil action, not just liability.  Section 3 specifies standards of proof for motions to dismiss a SLAPP and requires the court to rule on those motions within a specified period of time.

If a court grants a motion to dismiss a SLAPP, section 4 requires the court to grant the defendant, in addition to attorney's fees and costs, an additional amount of $10,000.  If a court denies a motion to dismiss and finds it was frivolous, the bill requires the court to grant the plaintiff reasonable costs and attorney's fees for responding to the motion.

That is my presentation.  I also have Marc Randazza in Las Vegas, who is one of the preeminent experts on this issue, if the Committee has any questions for me or Mr. Randazza.

**Chairman Frierson:**
Senator, do you want any comments from Las Vegas to be part of your introduction, or is that just someone available to answer questions?

**Senator Jones:**
I think he has a presentation.  It is up to you, Mr. Chairman, whether you want to hear from him first or ask questions.

Assembly Committee on Judiciary
May 6, 2013
Page 4

**Chairman Frierson:**
I would like to hear from him.

**Marc J. Randazza, Attorney, Randazza Legal Group:**
I am a First Amendment attorney.  I am based in Nevada, but I practice nationwide.  When you look at this bill, it is a pretty rare species of bill.  This is probably the first bill you are going to see where you are passing something that is both proconsumer and probusiness simultaneously.  This is not only going to protect consumers who want to exercise their right to free speech on government issues, commercial issues, and social issues, but it will also create an environment that will attract more tech jobs to this state.  I represent a number of companies that engage in social media, social networking, online media, and traditional media.  When I speak to them about where to generate bigger operations, where they should move, where they should be, the top of the list is always Washington, California, Oregon, and Texas, because these are states that have anti-SLAPP laws.  I will tell you why that is important.

As I mentioned, I defend First Amendment cases nationwide.  The right to free expression is severely hampered in states that do not have anti-SLAPP laws.  Let me give you a comparison between two of the states where I do most of my work outside of Nevada, which would be Florida and California.  A very long time ago, I had my very first SLAPP in Florida.  A gentleman came into my office who had had a dispute with a contractor, and the contractor said, "What are you going to do about it?  Go ahead and sue me.  I have more money than you."  He looked at his situation and said, "Yes, you are right.  There is not much I can do about that.  But I can warn other people not to do business with you," and he wrote a very truthful account of his experience, backed it up with documents, backed it up with evidence, and backed it up with letters from other people.  He was completely within his rights.  The contractor sued him for defamation and he came into my office and I said, "Yes, you can beat this," and we fought it, and we beat it.  At the end of it, I handed him his win and he looked at me.  It was a very formative day in my legal career.  He looked at me and said, "Well, if I won, how come I am the one with my retirement fund completely empty?  How come I am the one who is broke?"  I said, "I am really sorry."  In my inexperience as an attorney at the time, I really believed that if we were right, we would win.  We did; he has a case named after him, which he said is about as good as having a disease named after him.

Now I have run into the opposite experience in California.  I often get calls from people who say they are being sued in a similar case.  There is competition from other lawyers to get that case, even when the person cannot afford to pay, because when you see that it is a valid use of a citizen's First Amendment rights they are being sued for, they have the security of knowing that an

Assembly Committee on Judiciary
May 6, 2013
Page 5

anti-SLAPP law is standing behind them.  If that case has been brought because of that citizen's exercise of their right to free expression, and it is a case that has no chance of winning, that case is going to be dispensed with early, with the cost of that case falling on the plaintiff.  We need this in Nevada. We do not just need this because it is the right thing to do constitutionally. Your constitutional rights do not mean a whole lot if you cannot afford to exercise them.

One of my clients actually came here today.  He will be speaking as well, if you would like to hear from him, but he runs a relatively mid-sized media company. He has 26-odd employees, a third of them in Washington, a third in California, and a third here.  As they expand, they consider where they should move their operations.  They have to consolidate somewhere.  When they have those discussions and they ask me, I say, "You get frivolous lawsuit threats on a weekly basis."  So far—knock on wood—they have not been sued.  But when that happens, and it is inevitable that it is going to happen, if it happens here in Nevada, that can cripple a fledgling tech company like this.  So when these tech companies are looking at where they want to be, where they want to create jobs, where is the environment friendly for them, they look at Washington, California, Texas, and they look at Nevada.  Despite all of the great things that Nevada has to offer them, they know that they can be smothered in their cradle because of a lack of an anti-SLAPP law.

I think S.B. 286 (R1) is an example of some brilliant legislation.  It is going to put us at the forefront, it is going to make us a leader in this area, and I cannot see any reservation that anyone could have to this bill, unless you are the kind of person who wants to run around suing people in frivolous defamation suits.

**Assemblywoman Spiegel:**
On page 4 of the bill, in section 4, subsection 1, paragraph (b), it talks about how the court may award, in addition to reasonable costs and attorney's fees, an amount of up to $10,000 to the person against whom the action was brought.  I am wondering if they use that $10,000 in other states, or if it should be higher, or if it is higher in other places, to really be a detriment?

**Marc Randazza:**
As a First Amendment advocate, I certainly would not say it would be a bad thing to make that higher, but there is only one state that has statutory damages for violating the anti-SLAPP law, and that is Washington, and this is identical to Washington's bill.  So I believe the $10,000 is imported directly from the Washington statute.

Assembly Committee on Judiciary
May 6, 2013
Page 6

**Senator Jones:**
That is correct.    The Washington statute made the $10,000 mandatory. There were some concerns raised on the Senate side about that, so we made it discretionary in the court, so it could be up to $10,000.

**Assemblywoman Spiegel:**
Would you entertain a discussion of making it higher?

**Senator Jones:**
I certainly would.

**Assemblywoman Spiegel:**
Thank you.

**Chairman Frierson:**
Are there any questions from the Committee?  [There were none.]  On page 4, line  1, reducing it from 30 days to 7 days, has there been any conversation with the courts about the practical ability for the courts to comply?

**Senator Jones:**
Yes.  I had a discussion with Judge Elizabeth Gonzalez about that issue, and her concern had been that it needed to be after service.  Originally, as drafted, the bill said seven days after the motion is filed.  Her concern was making sure that the motion is actually served on the plaintiff before the seven days goes into effect.  She did not have an issue with the seven days, as long as the plaintiff had been served with the motion.  I have not talked with all the judges, but since I practiced before Judge Gonzalez a lot, and many of these go into business court, I figured that was a pretty good measure.

**Chairman Frierson:**
Thank you, Senator.  I know there is a good deal of flexibility with the business courts.  Are there any other questions from the Committee?  [There were none.]

**James McGibney, CEO, ViaView, Inc.:**
We are a social media company.  We are also involved in reality TV.  We have a massive online media presence.  This is very important to us because we get threatened with lawsuits on a daily basis.  As you can imagine, companies like Facebook and Twitter, anyone who has a social online presence, is constantly hit with lawsuits.  For example, Facebook is already protected by anti-SLAPP, and we would like to have the same thing in Nevada.  Even if we go through a trial and it is determined that we are not held liable for something that was posted on our site, we are still going to spend on average $100,000 in attorney's fees.  Being a company that makes a few million dollars a year, if we

Assembly Committee on Judiciary
May 6, 2013
Page 7

get hit with three or four of these per year, we could pretty much be out of business.  We have a presence in Washington, California, and Nevada, and we are actually thinking about going back to California because of the protections that are afforded there, but we do love Nevada.  We are very hopeful that this gets passed.

**Chairman Frierson:**
Are there any questions from the Committee?  [There were none.]  Is there anyone else wishing to offer testimony in support?   [There was no one.] Is there anyone wishing to offer testimony in opposition, either in Carson City or Las Vegas?

**Wayne Carlson, Executive Director, Public Agency Risk Management Services, Inc.:**
I had attorneys testify on the Senate side but, unfortunately, they are all out of town today, so I get the opportunity to try to clarify some of the things that we had concerns with in the bill.  We supported the expansion under section 1 to private as well as public.  We have had success with some of these cases where we have defended government entities against vexatious litigants, so it is an important bill from that standpoint to protect the private sector as well.

We have concerns under section 3, line 22, where they delete the existing process of motion for summary judgment, which we have used successfully and it has worked well.  Our testimony was that we did not think it was necessary to substitute it.  Part of the reason is because we have had successful awards from the Nevada Supreme Court fairly recently and they were supportive in analyzing the anti-SLAPP provisions.   Because the courts have clarity, we thought this might introduce an element of uncertainty in terms of the success of those kinds of defense motions for summary judgment.  We would suggest that the new language is not necessary because the existing process is successful.

The next area of concern is a practical matter.  We have never been able to recover attorney's fees and costs under existing law because the vexatious litigants did not have any funds or they filed bankruptcy in order to avoid it. It is meaningless to have a fine in there that you cannot collect, and that is the practical reality of it.  It was helpful to get that amended, but on the other hand, in section 2, it reverses that possibility.  That reversal of the possibility of the defendant having to pay a fine in addition to attorney's fees causes us to pause because it is very subjective as to whether or not the motion is frivolous or vexatious, and we would then be in a position to have to very carefully consider

Assembly Committee on Judiciary
May 6, 2013
Page 8

whether to even go forward with defending the case with a motion, whether it is a summary judgment or the proposed procedure.  That is a concern that we have.

Adding the appeal under subsection 4 of section 3, that is probably useful. We support that.  We are kind of mixed on the various elements of the bill, but we do not want to create a situation where it deters defendants from defending themselves because they could be subject to fines and penalties for trying to defend themselves from what are most of the time—the ones we have seen where we have used this defense—fairly frivolous and repetitive situations where the person just kept amending the suit every time they lost a motion. It creates a lot of litigation costs.  We are realistic that we will likely not recover costs from most of these individuals, but it does cost us money, and we do not want to be in a situation where we are now abandoning that strategy to defend these cases because of a provision in the bill.  I do not know how you fix it, but that is a concern that we have expressed.

**Chairman Frierson:**
It seems to me that you have two concerns that seem to counter each other. On the one hand, you were saying that you preferred it to be more like a motion for summary judgment, but on the other hand, you expressed concern about the defendant being exposed to attorney's fees.  It also seems to me that by not necessarily making it a motion for summary judgment, you create a process by which a defendant could defend being hit with attorney's fees.  It appears there is a balance attempted to be stricken here.  There are two points.  Number one is getting rid of the motion for summary judgment but creating this process. The court can still rule on it in a similar fashion with these things being considered and could dismiss the action in subsection 4 of section 3, so we do not seem to lose a great deal of that.  By creating a process, if the defendant is exposed to attorney fees, then this at least creates a process where they could defend it.

**Wayne Carlson:**
I am not an attorney, so I cannot respond to all the details like that, but our attorney did address it in his memorandum, which is on the Nevada Electronic Legislative Information System (NELIS).  On number four he says, "When a party moves for a special motion to dismiss under NRS 41.660(1), the party must first make a threshold showing that the lawsuit is based on good faith communications made in furtherance of the right to petition the government. A good faith communication is one which is truthful or made without knowledge of its falsehood."

Assembly Committee on Judiciary
May 6, 2013
Page 9

In number five, he says, "The purpose of the anti-SLAPP legislation in Nevada is to allow a defendant to extricate himself from the litigation early on without being put to great expense, harassment, or interruption of his productive activities." If these other procedures are going to increase the cost to pursue an anti-SLAPP strategy, then it is defeating some of the effort to try to make it easier and cheaper for businesses or governments that are subjected to SLAPP to get out of those suits. So early and quick is the better way. That is why we thought this other process seemed to add cost.

**Chairman Frierson:**
Who is this letter from? I am not seeing it.

**Wayne Carlson:**
It is a memo. It says, "From SCB to file." That was Steve Balkinbush's testimony. I believe it is on NELIS.

**Chairman Frierson:**
If you are talking about NELIS over in the Senate, then we would not have it.

**Wayne Carlson:**
Yes. I am sorry.

**Chairman Frierson:**
If he would like that to be circulated to the Committee, he would have to make sure to send it over. At least now we have what you are referring to on record, so the Committee can certainly look at the exhibits over on the Senate side.

Are there any questions from the Committee? [There were none.] Is there anyone wishing to offer testimony in a neutral position either in Carson City or Las Vegas? [There was no one.] Mr. Jones, would you come back up for closing remarks?

**Senator Jones:**
Mr. Balkinbush was there for the original committee. I think the general sentiment was, "We are okay with how it is," and the Ninth Circuit Court has said that it does not protect people in the way that it should, and that is what this bill is trying to address.

With regard to the concerns that a public agency could be subject to additional cost as a result of this legislation, I would respectfully disagree, and also direct the Committee's attention to section 4, subsection 2, where it speaks of someone who files these special motions to dismiss. The additional fees and $10,000 penalty only apply if the court were to find that the motion was filed in

Assembly Committee on Judiciary
May 6, 2013
Page 10

a frivolous or vexatious manner.  Mr. Chairman, as you are aware, it is pretty hard to show that someone's filing of a motion was frivolous or vexatious. I think that those protections are in the bill for public agencies that might be filing these suits and will not deter them in that effect.

**Chairman Frierson:**
Thank you, Senator.  I will direct the Committee that if they want to go back and look at the Senate side, they are more than welcome to do so for any of the exhibits.

[Also submitted but not discussed were (Exhibit C) and (Exhibit D).]

With that said, I will close the hearing on S.B. 286 (R1) and open the hearing on Senate Bill 60 (1st Reprint).

**Senate Bill 60 (1st Reprint):  Revises various provisions relating to businesses. (BDR 7-380)**

**Scott W. Anderson, Deputy for Commercial Recordings, Office of the Secretary of State:**
Senate Bill 60 (1st Reprint) proposes several changes to Title 7 and Chapter 225 of the *Nevada Revised Statutes* (NRS) that will further standardize and refine the filing processes of the Secretary of State's Commercial Recordings Division.  The bill also strengthens provisions relating to registered agent practices in the state.  We have met with representatives of the Registered Agent Association and the State Bar of Nevada Business Law Section in coming up with a bill acceptable to all parties.  I will touch on the major provisions of the bill and will be happy to answer any questions you may have as we go.  As you can see, the bill is quite large due to the fact that the same provisions are repeated in the individual entity chapters within Title 7. Therefore, I will not cite each section specifically, but I will touch on the substance of the provisions contained in the multiple sections.

Section 2 of the bill adds a penalty to provisions previously added to the individual entity statutes for purporting to do business without proper registration.  It adds to those that are only required to have a state business license—sole proprietors, general partnerships, and those required to have a business license but not required to file formation documents with the Secretary of State.  This section mirrors those already in statute relating to business entities doing business in Nevada without proper registration and is necessary to ensure that the same penalties for noncompliance with the filing requirements apply to sole proprietors and general partnerships as they do for corporations, limited liability companies, and other Title 7 entities doing business in Nevada.

Assembly Committee on Judiciary
May 6, 2013
Page 11

Section 3 of the bill clarifies that any claim for exemption from the state business license be renewed annually. Currently it is not clear that a claim for exemption must be renewed annually. Title 7 entities must renew their state business license annually as it is inexorably connected to the initial and annual lists. Since the requirement for an exemption may not be met annually, sole proprietors, partnerships, and those not filing annual lists that are claiming an exemption should be required to file a declaration of exemption on or before the last day of their exemption.

Section 4 of S.B. 60 (R1) expands what information contained in the state business license is considered public information. Currently, the information in the state business license application is considered confidential. Only the name of the sole proprietorship or partnership and whether such has a state business license may be disclosed to the public and, for that matter, to law enforcement. In addition to the name and license status, the street address where they are doing business in Nevada should also be disclosed. Title 7 entities must provide a physical street address where any legal process or notice may be served. We have received numerous complaints from persons wishing to serve process on a sole proprietor or a partnership but were unable to do so as they were unable to locate a street address for the business.

This section also defines that the information contained in the state business license application may be shared with law enforcement and any other state, local, or federal agency to assist in any enforcement action. This would treat the state business license information the same as information received for Title 7 entities.

Section 6 simply moves the provisions for the registered agent listing from NRS Chapter 78 to NRS Chapter 77, where they belong. Nevada has come under significant federal, international, and media scrutiny for its limited information for registered agent practices involving business entity creation and related services. The provisions in sections 6.3 through 6.9 strengthen Nevada's requirements pertaining to registered agents. Section 6.3 allows the Secretary of State to conduct examinations of any records required to be maintained pursuant to NRS Chapter 77 or any other provision of the NRS pertaining to the duties of a registered agent. Section 6.7 provides the procedures by which a penalty for a violation of this chapter may be recovered, which would be through a civil action brought in district court. It also provides for a noticing of violations and for the opportunity to correct a violation. This section also provides for Secretary of State action when a registered agent is found to have engaged in conduct that was intended to deceive or defraud the public or to promote illegal activities.

Assembly Committee on Judiciary
May 6, 2013
Page 12

Sections 7.2 through 7.9 provide provisions requiring that a registered agent with ten or more represented entities be registered as a commercial registered agent. A commercial registered agent must register with the Secretary of State and declare that the registered agent, or the principals of a registered agent company, have not been convicted of a felony or has been restored to his or her civil rights, that the registered agent has not had his ability to serve as a registered agent denied or revoked in this or another state, nor has been enjoined from serving as a registered agent.

The ten-entity-or-more threshold in the provisions allow for those registered agents serving as their own registered agent, or who may serve voluntarily as a registered agent, to do so without becoming a commercial registered agent. These provisions track very closely with those enacted by the state of Wyoming in their efforts to address similar registered agent practices.

Sections 10, 13, 16, 17, 19, 22, 24, 27, 29, 33, 35, 36, 39, 43, 46, 48, 51, 55, 61, 64, 67, 75, 78, 81, and 84 of the bill provide that a person specifically authorized by the entity may sign an annual list or other documents submitted by an entity. This allows for a more efficient filing of documents as it allows the authorized person to sign and eliminates the barrier of having to find an officer to file routine documents. This also allows registered agents to file routine documents for the represented entities. We expect that this will increase the usage of the Secretary of State's online services.

The bill prohibits naming of officers and directors in its annual lists with the fraudulent intent of concealing the identity of any person exercising the power or authority of an officer or director in furtherance of any unlawful conduct, and provides the fraudulent filing penalties of NRS 225.084 for violations. Again, Nevada has come under significant scrutiny regarding practices that make it difficult for law enforcement or other enforcement agencies to identify the responsible parties during the course of an investigation. We have worked with the Business Law Section of the State Bar of Nevada to craft language that will not prohibit acceptable practices.

The bill removes the provisions requiring a foreign corporation filing its qualification documents in Nevada to provide a certificate of good standing dated within 90 days from its date of incorporation. This is an antiquated provision that is cause for unnecessary rejections and delays in filing. This requirement is replaced by a declaration of the filer of the entity's existence and good standing in its home jurisdiction. Many other states have removed this requirement for such a certificate.

Assembly Committee on Judiciary
May 6, 2013
Page 13

Senate Bill 60 (R1) also removes the requirement that the registered agent information be included on the annual list of officers.  This is also an antiquated provision that has been made obsolete by the availability of registered agent information online through the Secretary of State's website, <www.nvsilverflume.gov>, Nevada's business portal.  This requirement is also confusing, as customers believe they can change registered agent information by changing the information on the annual list form.  This is incorrect, as other provisions in statute provide for changing registered agent information through a separate filing.

Sections 2, 12, 18, 25, 32, 38, 42, 45, 50, 57, 59, 60, 63, 69, 71, 72, 74, 80, and 83 add the interrogatory provisions of NRS 78.152, subsection 3, paragraph (b), allowing the Secretary of State to issue interrogatories relating to investigations of entities doing business in Nevada without proper registration.  The authority to issue interrogatories will allow the Secretary of State, when necessary, to more readily obtain information required, ensuring that Nevada entities are properly registered with the office.  These sections also remove the provisions that the Secretary of State may instruct a district attorney or the Attorney General to institute proceedings against a noncompliant entity.  This provision has been changed to a "may refer" provision per discussion with representatives of the district attorneys and the Nevada Prosecution Advisory Council.  We believe prosecutors should have prosecutorial discretion and this amendment recognizes that.

Sections 14, 15, 20, 26, 28, 30, 34, 37, 40, 44, 47, 53, 56, 65, 68, 76, 79, and 85 deal with business identity theft and reinstatements of entities.  The growing trend in the U.S. is corporate or business identity theft.  The unauthorized reinstatement or revival of seemingly defunct entities is one method perpetrators are using to conduct business identity theft.   This bill prohibits the reinstatement or revival of entities without proper authorization from the governing board of an entity or by court order and requires a declaration under penalty of perjury that such authorization has been received.  This provision will allow the Secretary of State to require additional information before a reinstatement or a revival is processed.  If one is fraudulently filed, the Secretary of State may investigate.   Current statute should be sufficient in penalizing the offending party.

Sections 11, 17, 21,23, 31, 35, 41, 49, 54, 58, 62, 66, 70, 73, 77, and 82 prohibit the creation of any entity for unlawful purposes or with the intent of creating false history by which, for example, one may gain favorable financing.  These provisions are also designed to discourage the creation of shell entities that are set up for no legitimate purpose other than to conceal money laundering activities or other unlawful activities.  They are also designed to discourage the

Assembly Committee on Judiciary
May 6, 2013
Page 14

creation of shelf or aged entities, called such as their existence is in paper only in a binder on a shelf. These entities are created for the sole purpose of creating a corporate history when there has been no legitimate business activity conducted. These entities are offered for sale at a substantial premium over the cost of initially creating the entity and filing the annual lists. They lend an air of legitimacy and a legacy of compliance when all that has been done is that the appropriate documents have been filed at the state or local level and certain meetings held. They have also been used to obtain financing for new businesses with the illusion that they have been in business for years. You can look on eBay or craigslist and find aged entities for sale at a significant premium.

Sections 86 and 87 simply correct the name of the International Association of Commercial Administrators in Chapter 104. Section 88 of the bill repeals provisions of NRS 78.795 that we are proposing to move to NRS Chapter 77 in section 6. This concludes my testimony. Thank you for the opportunity to testify this morning, and I will be happy to answer any questions.

**Chairman Frierson:**
In reviewing the bill, language is being used throughout the bill—the first use is on page 4, section 2, subsection 3, where it says, "the Secretary of State may require a person to answer any interrogatory . . . ." The thing that jumped out at me is any Fifth Amendment implication requiring someone who is being investigated for violating any of these provisions to answer interrogatories, and whether or not there is some problem with requiring someone who is being investigated to answer.

**Scott Anderson:**
That issue has not been discussed. We have the interrogatory authority already in Chapter 78 and the other entity statutes in regard to any investigation that we may issue interrogatories to assist in any criminal investigation that we are asked to, and this is adding that same interrogatory authority to our investigations of entities that are not complying with Nevada's registration requirements.

**Chairman Frierson:**
I get that, but asking a witness to respond to interrogatories is certainly different than asking a defendant or an accused or someone who is the subject of an investigation. To your knowledge, under the existing statute, are there times when an individual who might be subjected to criminal prosecution is provided an interrogatory? I would imagine they would advise him not to answer.

Assembly Committee on Judiciary
May 6, 2013
Page 15

**Scott Anderson:**
I do not have an answer to that question.  We would be happy to take a look at that and get back with you.

**Chairman Frierson:**
Thank you very much.

**Assemblywoman Spiegel:**
One of the things that concerns me is that we have seen some actions by registered agents in the past that have not been illegal and I do not think would fit under the provisions that you outlined in section 6.7, subsection 2 or 3.  Is there a way that we could have some of these things covered?  For example, in 2009, when we increased the license fee from $100 to $200, there were registered agents who went to their clients and said, "Nevada has doubled their business license fees.  It is no longer a business-friendly state.  You need to move your corporation to Wyoming."  They charged their clients a fortune to do that, and it hurt the state and it hurt their clients, because their clients would not really be able to recoup the extra $100 per year compared to the thousands of dollars that they were spending moving their businesses.  I am wondering if something was being done.  It was not defrauding them, it was not illegal, as I read it, by this, but it was clearly hurting businesses and hurting the state.

**Scott Anderson:**
We have some regulations in place that would already take care of this in regard to noticing and registered agent practices.  I would be happy to speak with you about any specific provisions you would like to see in here.  As far as the flight of entities from Nevada to Wyoming, it is somewhat anecdotal because while there may be some that have left, we have also gone through the most significant economic crisis recently.  We are also finding that entities are not being created because of uncertainties in the economy.  They are letting their businesses go because it is not economically feasible to keep them going. I would be happy to entertain any ideas you have.

**Assemblywoman Diaz:**
Page 4, lines 3 through 5, says, "the district attorney of the county . . . or the Attorney General . . ." can be the entities that can go after the person who conducts business in our state without obtaining the appropriate licensure. I would like to know how it is distinguished who is going to do it and who actually does the legal legwork behind it.  It is not clear to me.  It just says it can be one or the other.  How do we ensure who is doing what?

Assembly Committee on Judiciary
May 6, 2013
Page 16

**Scott Anderson:**
We would definitely consult with the Attorney General's Office with our deputy attorney general in regard to how this would be processed.  This is a relatively new process that we have recently started in our Compliance Division within our office.  We are just now starting to refer cases to the Attorney General's Office with their instruction on how we should proceed on it.  We do not have our own legal counsel within the office other than the deputy attorney general.

The Attorney General makes the determination as to whether they will take it on or if it should be referred to the district attorney.

**Assemblyman Carrillo:**
On page 4, lines 1 through 14, how are businesses which currently are not in compliance with having state business licenses held accountable now?

**Scott Anderson:**
Right now we are investigating and getting the information regarding noncompliance, and we are discussing that with the Attorney General's Office.  As I stated, this is a relatively new process.  In fact, our first referrals to the Attorney General's Office came this past week.  This is a new process for us.  We will be giving them a referral with information in regard to what we have found during our investigation, and then they will make the determination as to how to move forward.

**Assemblyman Carrillo:**
So up until now there really has not been a process in place to deal with this?

**Scott Anderson:**
There has not.

**Assemblyman Ohrenschall:**
My question is on page 6, lines 38 through 44.  What is the Secretary's rationale behind not allowing someone to correct an alleged wrong if they have had a violation in three years?

**Scott Anderson:**
What is the page?

**Assemblyman Ohrenschall:**
On page 6, subsection 2 of section 6.7, an alleged wrong can be fixed but not if there has been a violation in the last three years?

Assembly Committee on Judiciary
May 6, 2013
Page 17

**Scott Anderson:**
This provision follows the Wyoming provisions in regard to if they have had a violation in the past three years, they basically do not have the opportunity to correct because they have to keep a clean slate.  It was originally a five-year period and the registered agents asked if this could be a three-year period.  If they have been found noncompliant and they have had these violations, they would need to keep their slate clean for a period of three years so we do not have to continue going into the district court to ask for relief to penalize them and enjoin them from their practices.

**Assemblyman Carrillo:**
On page 20, lines 1 through 3, why is this being removed, and does the Secretary of State not need to have documents translated to English?

**Scott Anderson:**
This refers only to a certificate of good standing or a certificate of existence issued by another state that would be filed with the qualification documents.  We found that this is an antiquated provision.  Most states are getting rid of this with just having an affidavit or a declaration on their filings and the information regarding their filing in another state.  The entire provision would be removed, and therefore there is no need for that translation.  There are other provisions in statute that require that the documents coming into the Secretary of State's Office be translated.  This only relates to this certificate of good standing or certificate of existence that we are looking to remove.

**Assemblyman Carrillo:**
If something like that is required for translation, obviously that is going to require—I know this is not a money committee, but there has to be something attached to that in regard to the expense of translation.

**Scott Anderson:**
We would not be translating that.  The translation has to accompany the document.  The translation is the responsibility of the person filing the documents.

**Chairman Frierson:**
Are there any other questions from the Committee?  [There were none.]  I will now invite those here to provide testimony in support of S.B. 60 (R1) to come forward.

**Scott Scherer, representing the Nevada Registered Agent Association:**
We had a good debate on S.B. 60 (R1) on the Senate side and worked together to come up with an amendment that created the first reprint.  As it has been

Assembly Committee on Judiciary
May 6, 2013
Page 18

amended, we are in support of the bill.  I would like to note two things.
From our position, the concerns that have been expressed, especially at the
federal level, are somewhat overblown and have been addressed by current law
and regulations and the Secretary's regulations, so we believe that those are
adequate.  We also believe that we need to make sure we are staying on track
to compete with Wyoming and Delaware for corporate business here and make
sure that business owners also have rights to privacy to the extent that it is not
necessary to have that information be public.  We think the first reprint of this
bill is a good compromise that we can support.  There was in the language—and
this goes into section 6.7.  There are a couple of sections of our agreed-upon
amendment that were combined with the result being that on page 7,
subsection 3 of section 6.7, beginning on line 6, "the Secretary of State may
take any or all of the following actions," such as if there has been an intent to
deceive or defraud the public.  Our understanding of the original amendment
was that the Secretary would have the authority to deny registrations, but there
would be a civil action to revoke.  We are fine; we can live with this language.
It is our understanding—and we have been assured by the Secretary of State's
Office—that there will be due process given to either prove or disprove that
those prerequisite facts exist.  With that, we are comfortable with continuing to
support the bill as is.

**Chairman Frierson:**
Are there any questions from the Committee?  [There were none.]  Is there
anyone else wishing to offer testimony in support?  [There was no one.]
Is there anyone wishing to testify in opposition to S.B. 60 (R1)?  [There was no
one.]  Is there anyone in Las Vegas wishing to testify in opposition?  [There was
no one.]  Is there anyone wishing to offer testimony in a neutral position either
here or in Las Vegas?

**Robert C. Kim, representing the State Bar of Nevada:**
I am here on behalf of the State Bar of Nevada Business Law Section, and I am
the chairman of the Executive Committee.  Due to State Bar protocol, I cannot
support the bill necessarily, but we did work with the Secretary of State with
the language that is in the bill, particularly those relating to prohibition against
the use of any Nevada entity with respect to any illegal conduct and/or the
provision of names on annual or initial lists with a fraudulent intent.

My purpose of speaking is to clarify that these are in response to marketplace
factors that seem to have a negative view of Nevada entities.  It is not to say
that these activities were not prohibited beforehand, but this is merely meant to
emphasize affirmatively that such conduct is not permitted and the use of
entities in that regard is not allowed and to give the Secretary of State some
clear tools to enforce any illegal conduct or activity by means of a Nevada

Assembly Committee on Judiciary
May 6, 2013
Page 19

entity.  I wanted to reaffirm our work with the Secretary of State in this regard and to give clarity as to the purpose and intent of those sections.

**Assemblyman Ohrenschall:**
On page 6, when I asked that earlier question about the civil penalty that could be imposed under section 6.7, I think the deputy secretary also mentioned seeking to enjoin the registered agent.  I do not see that power specifically mentioned in this section.  Is it somewhere else in the bill that I am missing?

**Robert Kim:**
I do not have the familiarity with this bill to say whether it does or does not.

**Scott Scherer:**
That is in existing law—the right to get an injunction in the district court, in NRS 77.430.

**Chairman Frierson:**
Are there any other questions from the Committee?   [There were none.]  Is there anyone wishing to offer testimony in a neutral position either here in Carson City or Las Vegas?  [There was no one.]  I will close the hearing on S.B. 60 (R1) and open the hearing on Senate Bill 421 (1st Reprint).

**Senate Bill 421 (1st Reprint):**  **Requires a court to excuse a juror for cause under certain circumstances. (BDR 2-1109)**

**Peter C. Neumann, Private Citizen, Reno, Nevada:**
I am here to support Senate Bill 421 (1st Reprint).  Mark Twain was famous for saying, everybody complains about the weather, but nobody ever does anything about it.  I have been a lawyer since 1964, and I have tried, I think, 140 or 145 jury trials to a conclusion as both a prosecutor for the state of Arizona and as a defense attorney in criminal matters, having been appointed by courts to defend various defendants.  I have been a prosecutor or a plaintiff's lawyer in various types of civil matters, and I have also been a defense lawyer in various types of civil matters in my career, defending small businessmen, doctors, and others.  There is a jury selection process that the courts call voir dire, which means "speak the truth," in which the purpose is to ferret out people who are biased or prejudiced for or against one side or the other who come into the courtroom seeking a certain result before they have even heard the evidence and the judge can excuse those jurors, so what remains is a jury panel of people who come in with a clean slate, will listen to the evidence on both sides, and decide according to the law given to them by the judge.

Assembly Committee on Judiciary
May 6, 2013
Page 20

There are two ways of getting those biased jurors out of that particular trial. One is peremptory challenges, which are given to both sides by this Legislature. In Nevada it is four per side in a civil action and in most criminal actions, although in capital murder cases it is eight.  In those peremptory challenges, either side may excuse a juror for no reason at all just because you have a feeling or your client has a feeling, maybe a gut reaction, that that juror is not going to be fair or maybe will not get along with the other jurors on the panel or will be a troublemaker in some way.  We get four peremptory strikes.  These are very precious to the parties in the lawsuit and their attorneys.  It has been my experience that I always wished I had at least one or two more peremptory challenges because when it came down to the use of those strikes, I usually had to juggle one or two of my strikes and say, "Well, this fourth strike that I have, should I go with Juror A or Juror B?  They are both looking pretty bad," so I made an educated guess and half the time I guessed wrong.

The other way to excuse a juror who is biased or prejudiced is the use of a for-cause challenge, and that is what is addressed in S.B. 421 (R1), which, in my opinion, is simply a housekeeping bill which does not establish any new law but establishes a legislative standard by which trial judges will continue to exercise their discretion in deciding a challenge of a juror "for cause."  There are a few judges—and this is all over the United States and I have attended many, many seminars nationwide, where lawyers and some judges have complained about this.  There are a few judges who believe it is incumbent upon them to rehabilitate a juror who has openly expressed that he or she is not fair or is unfair or is biased or prejudiced for or against one side or the other. This happens all the time.  When this happens, the party to that lawsuit, whether it be the state of Nevada in a criminal case, or the plaintiff for a defendant in a civil case, has the opportunity to challenge that juror for cause. The statute, which was written in 1911, *Nevada Revised Statutes* (NRS) 16.050, has some pretty old-fashioned language in it, which is okay.  I do not condemn that.  The problem is that statute does not actually say what the judge is supposed to do when the juror has been shown to be—and the judge determines—biased or prejudiced for one side or the other.  It is implied, I am sure, because it says the judge shall—and it uses the word "try"—try the issue of the challenge, but it does not create a standard.

Now there are many Supreme Court cases that do use many, many pages of case law that established the standard, but there is no statutory standard.  In the heat of battle, the parties only have a very few minutes to exercise both peremptory challenges and for-cause challenges, and the judge is pressed and has to make a decision very quickly as to whether or not to excuse a juror for cause and ask that juror to come back on some other case.  The juror does not get off the hook by being excused for cause except on that case, and usually

Assembly Committee on Judiciary
May 6, 2013
Page 21

the judges will tell the juror, "Well, if I excuse you, sir, you understand, do you not, that you must come back.  You have to report to the jury commissioner downstairs in the courthouse and come back and you will be summoned later on maybe this month.  By the way, the case that you are on is only going to be a four-day jury trial, but if you get excused for this case, I must warn you that when you come back for another case, which might be as early as three weeks from now, that case may be a ten-week jury trial or may be a two-month or three-month jury trial.  So keep that in mind."  Anyway, what happens is some judges—not all of them by any means, and I think they are in the minority—take it as incumbent upon themselves to rehabilitate a juror who has already said he or she cannot be fair.

Here is how it works, for those of you who have not had the pleasure of being in a lawsuit or being a trial lawyer in a lawsuit—and it is not very much fun.  The judge will often say to the juror, "Mr. Jones, you have said that you cannot be fair to the defendant in this case, but you understand, do you not, that you are under oath to be fair, that you understand that it would be against the law for you not to be fair.  You understand that there could be penalties and it is very important for you to be fair.  I am the judge here, and I am telling you that."  The judge is sitting on the bench with a black robe on with the authority in the courtroom, and nine times out of ten, when that happens, that juror who has just said a few minutes ago that he or she will not be fair, says, "Well, when you put it that way, Judge, yes, I can be fair."  So the magic words have been said by the prospective juror.  It has not changed anything, and everyone in the courtroom knows that it has not changed anything.  The juror is still going to be in the same frame of mind; it is just that the judge has sort of bullied him or her into saying those magic words, "I can be fair."  So what the effect of that is is that the aggrieved party—let us say it is a businessman who is being sued by a plaintiff—knows that juror is not going to be fair to him, and so he instructs his attorney to use one of the very valuable peremptory challenges on the juror.  The problem is that we do not have enough peremptory challenges ever, and so it is unfair and also kind of against the body of law that has been established for the judge to do that.  If the juror is unfair, then the judge is supposed to, under the law, excuse that juror and have him come back for some other trial.

This bill is an attempt to put in a legislative standard that the judges can look at in a quick and dirty way.  This is my bill.  It is not a trial lawyer's bill.  I did not consult anyone on this bill.  I did not consult anyone at all, actually.  I just wrote the bill.  Well, I told Tick Segerblom I was going to do it, and he understood because he has tried cases.  He liked it.  When I did this bill, I was on my own.  I drafted the language of it, and originally I made it both for criminal and civil.  Some of the judges expressed to me, "Well, the prosecutors might have a

Assembly Committee on Judiciary
May 6, 2013
Page 22

problem with this bill, especially in capital murder cases, because they are trying to find 12 people who are willing to put someone to death in a heinous case, and that is not an easy task."  As an old prosecutor, I can tell you that.

I thought the language I chose was the most moderate and most reasonable, the standard that the judge will use in determining—and it is still the judge's call.  Nothing has been changed.  The judge is the decider of this, but the test the judge is supposed to use under this bill is, if the judge determines that the juror in question, who has been challenged, is more likely than not to be biased or prejudiced, for or against any party, the judge then has the duty, stated in the law, to excuse that juror.  It is pretty simple.

I put in the other thing at the request of someone—because I found out that some judges, especially in Clark County, do this already, and I think it is a very good idea.  When a for-cause challenge of a prospective juror occurs, some judges will handle that outside the presence of the other jurors, such as in chambers, or excusing all the jurors before the for-cause challenge is "tried" by the judge.  That is to prevent or minimize the chance of other jurors mocking the answers of the challenged juror, and then trying to get out of jury duty by using the same language.  That is the reason for putting that little phrase in, "may be held in chambers."  It is still the judge's discretion.  The judge might say, "No, I am going to do it in open court" and can do so.  That is why I brought this bill.  I have seen this happen so many times and I have heard other trial lawyers and other judges complain about this practice of rehabilitating jurors, not only in Nevada, but in many, many of the states, that I thought, "Why not put in a standard, because the 1911 law does not have a standard."

**Chairman Frierson:**
Thank you, Mr. Neumann.  Senator Segerblom, I apologize for not realizing you were going to be a part of the introduction.  I would have waited for you.

**Senator Tick Segerblom, Clark County Senatorial District No. 3:**
There has been some discussion that we should not get involved in this process because this is for judges only.  First off, the statute already governs for-cause, so it is a legislative issue, and secondly, at the end of the day, we represent and set public policy, and if we find that there is a need to change the law or make it clearer, then that is our role.  Judges interpret the law, but we set the law.  I think it is appropriate for us to be involved in this issue.

**Robert T. Eglet, Private Citizen, Las Vegas, Nevada:**
I am a partner with the law firm of Eglet Wall Christiansen, Trial Attorneys, in Las Vegas, Nevada.  Mr. Neumann asked me to come up and testify before you with respect to this bill, I suspect, because of my experience with jury selection.

Assembly Committee on Judiciary
May 6, 2013
Page 23

I have been practicing law primarily in Clark County for 25 years.  The first roughly 12 1/2 years, or half of my years of practice, I was exclusively a defense attorney.  For the last roughly 12 1/2 years I have been primarily a plaintiff's attorney in the area of personal injury and wrongful death.  However, my firm also represents a number of corporations in southern Nevada in commercial litigation, so we are often on the defense side as well as the plaintiff's side in those cases.  I also often represent medical doctors in Clark County as personal counsel in medical malpractice cases.

I have tried to verdict well more than 100 jury trials in Nevada, and I have started—which means I finished jury selection in more than 100 jury trials in Clark County, because often jury cases settle during the middle of trial.  I can easily say that I have selected more than 200 juries over my career.

Many years ago while I was a defense attorney, I saw this problem that Mr. Neumann was discussing with the rehabilitation of jurors who clearly had expressed a bias at some point during jury selection, and then the judge will go and attempt to rehabilitate them by asking them what we call "the magic question."  They are sitting up there on the bench in their black robe and they say, "Well, Mr. Smith, in spite of what you said, you will follow the law, will you not, that I give you?"  "Well, yes, Your Honor, of course I will follow the law."  "Therefore, you can be fair and impartial in this case, can you not, in spite of your biases, in spite of your prior experiences?"  There have been independent studies across the country over the past several decades and what happens is that invariably, even though the juror has a bias, they do not want to tell the judge, who is wearing a black robe and sitting above them with a lot of authority, that they cannot be fair and impartial and that they cannot follow the law, even though—it is essentially almost an intimidation thing that occurs because they do not want to engage in it.  Then what happens because of that, other jurors who may also have biases are afraid to express their biases once they have seen this occur with the judge, so you end up with jurors on the panel who have a bias one way or the other.

Some states, in recognizing this problem, have actually even taken it to an extreme, which I certainly do not recommend.  For example, the state of New York does not even allow the judge to be present during voir dire.  Only the attorneys and the venire are present during voir dire, and the trial judges are not present because they have recognized this problem.  I do not support that kind of thing in Nevada because I think New York's way of jury selection is rather inefficient, but I think this bill that has been proposed can certainly take care of these problems.

Assembly Committee on Judiciary
May 6, 2013
Page 24

When I recognized this problem as a defense lawyer years ago, I began to do a lot of research across the country. I researched every case there was on jury selection and read just about every book there was on jury selection. I have published myself in this area and over the last eight to ten years I have lectured to the trial lawyers here in Nevada. When I say trial lawyers, I do not mean just plaintiff's trial lawyers; I mean trial lawyers who try on the defense side as well as the plaintiff's side. I have lectured and taught jury selection all over the country to various states, trial lawyer organizations, as well as national organizations. This is a problem, not only here in our state, but some other states. But some other states have done things to rectify this situation.

I cannot express to you enough that the right to trial by jury is a constitutional right under both the *U.S. Constitution* and *Nevada Constitution*, and the right to trial by jury only means something if the jury—the entire jury, every member of the jury—is fair and unbiased and states so unequivocally before the trial begins. Voir dire is the practice that exists to make sure juries are fair and unbiased, and I believe that <u>S.B. 421 (R1)</u> and the standards protect this constitutional right. In fact, the United States Supreme Court has stated that the importance of a truly impartial jury is so basic to our notion of jurisprudence that its necessity has never really been questioned in this country, and the U.S. Supreme Court has recognized the fundamental importance of impaneling a fair and impartial jury, stating it is difficult to conceive of a more effective obstruction to the judicial process than a juror who has prejudiced the case. The U.S. Supreme Court in the *Wainwright v. Witt*, 469 U.S. 412 (1985) case, which is a 1985 case and is the seminal case from the U.S. Supreme Court on jury selection, held that prospective jurors must be excused if their views would substantially impair their ability to perform their function as jurors and the impairment need not be shown with unmistakable clarity. I think the last part of that statement from our country's Supreme Court is in line with this bill, which gives the trial judges a standard which is simply a more likely than not standard as to whether the potential juror would be biased or not be biased, for or against any party. I would suggest that the U.S. Supreme Court statement in *Wainwright* that the impairment need not be shown with unmistakable clarity stands for that proposition. In other words, it is not a higher standard. It is just more likely than not. It just has to tip the scales, just like the burden of proof in civil cases.

I know that some of the opposition to this case has been that certain people think this is going to extend jury selection. My first response would be, "Well, even if that were true, that does not trump a party's constitutional right, both under our state and federal constitutions, to a fair and impartial jury." I would suggest that, in fact, this bill will save time in jury selection. One of the reasons for that is that the Nevada Supreme Court came down with a case

called *Jitnan v. Oliver*, 127 Nev. Adv. Op. 35, 254 P.3d 623 (2011), several years ago.  It is a case where I actually handled the appeal before our Nevada Supreme Court here.  I did not handle the underlying trial.  In that case, there was a potential juror who clearly expressed a bias against one of the parties in the case.  Even after the defense attorney got up and tried to rehabilitate the juror, he continued to express a bias.  Even after the judge tried to rehabilitate the juror, the juror somewhat backed off, but there were still hints of a bias.  The trial judge did not excuse that juror for cause when a challenge was made, and as a result, one of the attorneys had to use a peremptory challenge against that juror and was left with the situation that Mr. Neumann discussed.  Now he did not have enough peremptory challenges to remove all the jurors that he felt were negative or against his client.

The Nevada Supreme Court has clearly said in case after case that there are two basic purposes for voir dire in Nevada and why it is so important in Nevada for counsel to be able to participate in voir dire.  The first purpose is to ferret out, or attempt to ferret out, any jurors who have some prejudice or bias that would make them unfit to sit on the jury, that they just simply cannot be fair and impartial.  The second purpose is for counsel to be able to garner or gain information so that they can make their peremptory challenges based on intelligent information and not on demographics and race and things that are not correct or proper under our law.

It is made clear that the first important part of jury selection of ferreting out bias is those people should be excluded for cause.  What happened in the *Jitnan* case was the Supreme Court ultimately found that the district court judge abused her discretion and that she should have struck that jury—it caused an appeal in the case that probably would not have occurred but for this problem with the jury selection.  Because of what the Supreme Court did in this case—they really did not set forth a standard that the trial courts should use in evaluating whether a juror should be excused for cause or not—it really left it as a subjective thing for the judge.  But, in fact, what that case did because the Supreme Court did not set forth the standard, it extends jury selection.  It requires that if one of the parties, and this is what the Supreme Court's opinion did, challenge is either granted or denied by the trial court, who expresses a potentially disqualifying opinion or bias, that the trial counsel must then ensure that the trial judge sets forth on the record her reasons for the grant or denial of the challenge for cause.  You must make sure that the court makes an extensive record.

Secondly, trial counsel must now challenge any prospective juror for cause if trial counsel states, or if the juror states, any potentially disqualifying opinion or bias during voir dire, which would not necessarily be required by this bill.

Assembly Committee on Judiciary
May 6, 2013
Page 26

Third, if trial counsel loses a challenge for cause prior to the exercise of peremptory challenges, trial counsel should make an extensive record that he or she is now forced to use one of his or her peremptory challenges on a prospective juror that should have been excused for cause.  There are now more objectionable prospective jurors to trial counsel's clients remaining on the panel than peremptory challenges trial counsel has to exercise and request additional peremptory challenges to rectify the situation, which will rarely be given.

Fourth, once peremptory challenges are exercised and the district court asks if trial counsel has any objection to the jury as seated, trial counsel should make a record that trial counsel does object to the jury as seated and then clearly set forth on the record which juror is objectionable to trial counsel's client and why he is objectionable.  Then trial counsel should also clearly identify which juror on the jury, as seated, trial counsel would have exercised a peremptory challenge against had the court granted trial counsel's challenge for cause.  Because the trial court denied counsel's cause challenge, there are now members of the jury that are objectionable to the trial counsel's client.  Now this is a very tedious exercise, which is going to drastically extend the voir dire process for this case.

I believe this bill gives the trial courts a standard to use when making this decision as to whether a challenged potential juror should be excused for cause or not, a standard that is not set forth currently in the law.

Because of the *Jitnan* case, I would suggest that under the current state of the law as it is, it is going to extend unnecessarily the voir dire process in civil cases.  This is not just a problem for one side of the case or the other.  As some members of the Committee may know, I have been lead counsel on the cases involving the hepatitis C outbreak that occurred in 2008 in Clark County.  I have now tried three cases to verdict.  One case settled right before we began closing arguments.  That case is a perfect example of how this bill would substantially assist the defense attorneys in that case.  Because of the extensive publicity in that case, each of the trial judges in the case had 500 prospective jurors fill out questionnaires.  As plaintiff's counsel, as some less experienced plaintiff's counsel may not understand, I knew that I cannot get a verdict that is not going to hold up on appeal.  I have to protect the record as well as the judge for my own purposes.  So I stipulated to excuse any jurors who said something in their questionnaire that showed they had a bias against the defendants.  About 250 out of 500 people said because of the publicity that they were going to favor any party who got hepatitis C because of these cases.  So we excused them.  Many of these people did not express this opinion in their jury questionnaire, and when it came to the voir dire process, we had juror after juror after juror, after my probing them by some of the things I saw in the jury questionnaire, state that they would have a bias and tend to favor my clients in

Assembly Committee on Judiciary
May 6, 2013
Page 27

the case.  Now, if I was not interested or was not thinking about the appeal, and I was just an attorney who was trying to stack the deck and I knew I had a judge—and there are many judges in Clark County who would rehabilitate that juror—I could have just said, "Okay" and passed.  If the defense attorney tried to strike them, I could attempt to rehabilitate them and could have ended up with a jury stacked full of people who would have been unfair and biased against the defendants before the case started.

I just recently finished a case where the same thing occurred.  Even though we had dismissed almost half the panel based on their questionnaires, I was able to pull out the first 50 people on the panel because they had biases, because they could not be fair and impartial.  I teach this around the country.  I suggest that trial counsel on both sides—whether it is the defendants or plaintiffs—should be trying to get a completely fair and impartial jury before the trial begins, because nine times out of ten, when you have a juror who engages in some misconduct, it is one of those jurors who has expressed a pretrial bias in the case, did not follow the rules, caused problems, and caused appeals.  So under the current state of the law, it causes many more appeals on this issue whereas if we had this standard, it is going to lessen the number of appeals, it is going to give the judges an actual standard.

This issue that some people have expressed about the judges may try this in chambers—what that really means is they do not take the parties back to chambers because they want to make a record of it.  They excuse the jurors from the courtroom and then we argue over the challenge outside the presence of the other jurors.  Sometimes we may bring that one juror back in for additional questioning.  So it is a practice—at least in Clark County; I can tell you, I have tried cases in virtually every department in Clark County—it is a practice that is done by almost every judge in Clark County now, not having these arguments for challenge in front of the rest of the panel.  It does not really change anything by having that in there.

It is my view that S.B. 421 (R1) will save costs.  These trials cost a lot of money.  If we have to retry them based on having a bad juror and we get a new trial—well, in some of the cases I have tried over the last few years, the parties have incurred millions of dollars in costs just to get through the trial, and it has cost the county an extensive amount of money because some of these trials have lasted as long as four or five months.

**Assemblyman Wheeler:**
If you run out of your peremptory challenges and you still think a juror is biased, would you take it to the judge and say, "Now you must follow this new rule?"

Assembly Committee on Judiciary
May 6, 2013
Page 28

**Robert Eglet:**
Actually, the way this is written, the challenges for cause are done before peremptory challenges, during the voir dire process. The judge makes these decisions before we ever get to the peremptory challenge stage. This just gives the judge specific guidelines on how to make those decisions, and once that is done, and both sides have exercised all the cause challenges they wish to make, then we go into the peremptory challenge stage. It is two separate sections of voir dire.

**Assemblyman Ohrenschall:**
I remember a case a decade or so ago out of Las Vegas, and it was a jury trial. The foreman was very convinced, in his opinion, and there was one holdout and I remember hearing in the media after they came back that that juror had been in tears because the foreman really bullied her and bullied all the other jurors. I wonder, if this measure passes into the NRS, do you think that can be avoided? It happens more often than people think, where you do get a member of the jury, maybe it is the foreperson, who is a bully and so confident in their opinion and then you have folks who are scared to hold out if that is what they really believe.

**Robert Eglet:**
I think those situations will be lessened significantly. I certainly cannot guarantee that is not a point that will occur. You may have someone on the jury who, after the evidence has been presented, has a very strong opinion one way or the other and they are very vocal and they engage in bully tactics. I think it will significantly lessen the number of people who are able to get on a jury with a preconceived idea of what the outcome of the case should be.

**Assemblyman Hansen:**
We started off with a quote by Mark Twain, and one of my favorites is, "We have a criminal jury system which is superior to any in the world; and its efficiency is only marred by the difficulty of finding twelve men every day who don't know anything and can't read." The reason I bring that up is you do have paragraph (f) in this bill. "Having formed or expressed any opinion or belief . . . ." You want to be able to remove anyone for having any knowledge whatsoever apparently—of course, it says you can read the newspaper. Why is it limited to civil actions? Why would this not also apply to the criminal jury selection process?

**Peter Neumann:**
The change in the existing statute puts in "any opinion" instead of "an unqualified opinion." I actually suggested that change because I did not know what an unqualified opinion meant. I asked a lot of people and they did not

Assembly Committee on Judiciary
May 6, 2013
Page 29

know either.  It is just housekeeping for the present statute, which says that if the prospective juror has "formed or expressed an unqualified opinion or belief as to the merits of the action, or the main question involved," then that juror should not serve, although it did say the reading of newspaper accounts was not a reason to disqualify the juror.  I thought it would read a little better if it said, "any opinion" instead of "an unqualified opinion" because I think we are trying to find people who do not have an opinion on how the case should turn out before they have heard the evidence.  That was the reason for it.  I forgot what your other question was.

**Assemblyman Hansen:**
Why civil only?  Why not criminal and civil?

**Peter Neumann:**
When I originally suggested the language of the bill, I did not exclude criminal cases.  One of the judges, Judge Janet Berry, who is a very experienced judge in Washoe County, told me that she thought that some of the prosecutors in the criminal area, especially in capital murder cases where they are having a hard time getting twelve jurors who will be willing to exact the death penalty, might have an objection to this.  So she said, "Why do you not just limit it to civil cases and then put a sunset on there and if people do not like it then it expires on the sunset, and if they do like it, then hopefully the Legislature will renew it and expand it to the criminal as well."

**Assemblyman Hansen:**
In section 1, paragraph (g), it says, "The existence of a state of mind in the juror . . ." and then you cross out, "evincing enmity against or bias to either party."  What is the difference between what you are eliminating and what you are adding?  You have it that the juror's biased for or against any party to the proceeding.  It seems like it is splitting hairs to me.

**Peter Neumann:**
Yes, I agree with you.  It is splitting hairs.  "Evincing enmity" was drafted in 1911, as I understand it, and that is old-fashioned language and I was just trying to make it a little more simple.

**Assemblywoman Dondero Loop:**
On page 2, paragraph (f), it talks about the reading of newspaper accounts of the subject matter.  With this day and age of technology, is there a need to add anything else in there?

Assembly Committee on Judiciary
May 6, 2013
Page 30

**Robert Eglet:**

Certainly most people now do not get their news from the newspaper. They get it from the Internet or Twitter or other social media things that are going on. I know that we have—in fact, I actually rewrote the instructions for the admonition for the judges to now give to the prospective jurors because it used to be limited to newspaper or TV news accounts, and now we have all that in there with respect to social media and the Internet. The admonition they give the jury now every time—at least in Clark County; I cannot speak for Washoe County—is now inclusive of all forms of media and it is mentioned in the admonition every time there is a break that they give to the jury. I do not think we would have any objection to adding that language.

**Peter Neumann:**

I think it is a good idea, although I hope it would not derail the bill by tinkering with it. I agree with what Mr. Eglet says. Our judges in Washoe County do that too. We do not know whether the jurors follow that or not. There have been reports that some jurors will go out during the middle of a trial and read up on something. There have been some cases over the years where jurors have actually gone to the scene of the crime or the scene of an accident and looked at things for themselves, and that gets back somehow—maybe the bailiff hears about it in the jury room and the bailiff reports it to the judge—and that will cause a mistrial. A good judge will admonish the jurors not to do that, such as, "Jurors, I know you want to find out, but you have to follow the law, which is that the evidence comes in through this courtroom and you have to decide the case on what comes in. If you go out and do your own investigation, you could cause a major problem."

**Robert Eglet:**

In the trial I just finished, we had a juror who stayed on the panel for most of the jury selection. At the beginning he had expressed bias in favor of my clients in the case, and the defense attorney requested that he be excused and I did not object. At that time, the trial judge indicated, "Well, I do not think he has said enough yet," and, in fact, a week into jury selection, we discovered that he was tweeting information about the juror process and the trial and what was going on. That gives you the example I was talking about. It is usually these types of jurors who engage in this type of misconduct and ultimately he was excused.

**Chairman Frierson:**

Are there any other questions? [There were none.] I believe there is an amendment that is being proposed, and I have been reading back and forth and doing some research myself. Mr. Neumann, I assume you are aware of

Assembly Committee on Judiciary
May 6, 2013
Page 31

the proposed amendment and if you are, would you let us know what your thoughts are?

**Peter Neumann:**
I have read the amendment just recently, and I would never turn down more peremptory challenges, because that is what the amendment basically does. The amendment would wipe out all of the language in S.B. 421 (R1) and substitute the addition of two more peremptory challenges in civil cases and four more in criminal cases.

I have never had a case where I did not want more peremptory challenges. I would not turn that down; however, I do not think it is going to address the problem that I have tried to address in S.B. 421 (R1). Even if you give both sides two more peremptories, you still have a limited number of peremptories. If the judge refuses to excuse a juror who is obviously biased for or against one side or the other, you still have the problem that the *Jitnan* case addressed—and in other cases, too, like *Thompson v. State*, 111 Nev. 439, 894 P.2d 375 (1995), which is a criminal case, where the court is saying it is not fair to the party who is aggrieved by that biased juror to make that party use up one of their challenges. The challenges are limited by necessity. The court, by the way, has said that the right to voir dire by parties in a lawsuit—whether it is civil or criminal—is a constitutional right, and the right to challenge a biased juror is a constitutional right. I hate to admit this, but the fact that we get any peremptory challenges or not, that is a legislative grant completely, and our court has said, "There is no guarantee constitutionally to peremptory challenges at all."

I admire the suggestion of giving two more peremptory challenges in civil cases and four in criminal cases, but it still is not going to solve the problem that we do not have a standard which judges use to exercise the challenge factors in the high profile cases which Mr. Eglet has so much experience with.

**Chairman Frierson:**
Thank you. I will now invite those who are wishing to offer testimony in support of S.B. 421 (R1) to come forward either here or in Las Vegas. [There was no one.] Is there anyone wishing to offer testimony in opposition here or in Las Vegas?

**Stephanie H. Allen, representing the Nevada District Judges Association:**
I am here in opposition to S.B. 421 (R1). On the Senate side, we testified in the neutral position, but we also placed on the record some concerns that the Nevada District Judges Association may have with the bill. Subsequent to that, they recently had their conference, discussed the bill at length, and voted to

Assembly Committee on Judiciary
May 6, 2013
Page 32

oppose S.B. 421 (R1).  I provided for your information a letter from the new president, Judge James T. Russell, on the Nevada Electronic Legislative Information System (NELIS) (Exhibit E) as well as a proposed amendment (Exhibit F) that was previously discussed.  Judge Russell wanted to be here today but unfortunately had a conflict in court, so for your information I would like to read his letter in opposition for the record.

The purpose of this letter is to relate to you and the members of your committee that the Nevada District Judges Association, at its recent conference, voted to oppose S.B. 421 (R1).  [Continued to read from (Exhibit E).]

On NELIS, for the Committee's information as well as for the public, we have provided an amendment (Exhibit F) to that effect which would increase the peremptory challenges in both civil and criminal matters.  I believe Mr. Neumann testified at the very beginning that there are a few occasions where judges may not exercise their discretion in their for-cause challenges, and in those instances, by increasing the peremptory challenges, they would have those one or two extra peremptory challenges to correct those errors.  We believe this is a viable alternative.  It would keep the current law that has been in place for many, many years as it is, allow the judges to have their continued discretion, and to use their discretion in making those determinations.  With that said, I am happy to answer any questions, and thank you for your consideration.

**Assemblywoman Cohen:**
The letter seems to give us reasons with no basis for the reasons.  Could we get more information?  We have a list of these things but no background for the list.

**Stephanie Allen:**
I will be happy to get more information.  I think generally the judges think that the standard and the ability for them to use their discretion under the existing law is sufficient, so the alternative was proposed to provide some additional checks and balances in the cases where perhaps someone should have been discharged for cause and they were not, then you would have those additional peremptory challenges.  I am happy to get some more information for you and let you know.

**Chairman Frierson:**
Some of the provisions of the bill seem to do the opposite of some of the court's concerns.  It would seem to me that there is a chance this could decrease the number of appeals by providing more options and making sure that jurors who do have bias are removed.  As a trial lawyer, I agree there is nothing

Assembly Committee on Judiciary
May 6, 2013
Page 33

more frustrating than finding a juror with bias and then sitting and watching
them be rehabilitated back into being all of a sudden unbiased.  It is frustrating.
It does not surprise us that the court would have some concerns about
restrictions.   They are some valid concerns about the rehabilitation of some
jurors in particular that is frustrating in the trial process.  Anything that you can
get back to the Committee from the judges I think would be beneficial.

Are there any other questions from the Committee?   [There were none.]
Is there anyone else wishing to offer testimony in opposition to S.B. 421 (R1)?
[There was no one.]   Is there anyone wishing to offer testimony in a
neutral position?

**Chris Frey, Deputy Public Defender, Washoe County Public Defender's Office:**
We are in a neutral position this morning.  We are also in a neutral position on
the Senate side with respect to S.B. 421 (R1).  We would note, though, that we
have reviewed the amendment submitted by the Nevada District Judges
Association and we would be supportive of the proposed new section 6,
increasing the number of peremptory challenges in a capital case as well as
increasing the number of peremptory challenges in regular criminal cases.
Certainly, we would echo the proponents' sentiment.  We are not going to
object to more peremptory challenges.   We think on net it is a good
improvement and we support it.

**Chairman Frierson:**
You are talking about the proposed amendment?

**Chris Frey:**
Correct.  We are neutral on the substance of the bill as drafted, but we are
supportive of the proposed new section 6.

**Chairman Frierson:**
Are there any questions for Mr. Frey?  [There were none.]  Is there anyone else
wishing to offer testimony in a neutral position either here or in Las Vegas?
[There was no one.]  Senator, do you have any closing remarks you would like
to make?

**Senator Segerblom:**
I think you were correct to point out the judges' opposition seemed to be
lacking in specifics.  What they do mention is the fact of having dual standards
for civil and criminal, and if you want to put criminal back in, I think that would
be appropriate.  If you want to add peremptories, that would be great too.
This is just a two-year sunset.  I think we have identified a real deficiency in our
current law as far as no standard, and I think it is worth trying.

Assembly Committee on Judiciary
May 6, 2013
Page 34

**Chairman Frierson:**
So you would be okay with adding their proposed amendment to the existing bill and also putting criminal back in?

**Senator Segerblom:**
Yes.

**Chairman Frierson:**
Thank you.  With that, I will close the hearing on S.B. 421 (R1) and open the hearing on Senate Bill 441 (1st Reprint).

**Senate Bill 441 (1st Reprint):  Makes various changes to provisions governing business entities. (BDR 7-166)**

**Robert C. Kim, representing the State Bar of Nevada:**
I am here in my capacity as chair of the Business Law Section of the State Bar of Nevada to present to you Senate Bill 441 (1st Reprint), which is a stunning collection of amendments to our business law statutes meant to design a more flexible and better way of doing business in our state.   The Executive Committee for the Business Law Section meets 15 to 20 times during the off year, the even-numbered year, to prepare a bill for submission.  This has been conducted since the early 1990s in terms of the process that is before you. We glean from suggestions that we are provided.  We also take from our own practice, we take from trends in the marketplace in terms of aspects of corporate law, limited liability company, partnership law, entity law that should be considered, and incorporate it or flat-out reject it, for that matter, to the extent that it is not consistent with what needs to be a flexible business-friendly environment.

To clarify the approval process, S.B. 441 (R1) has been approved by the State Bar of Nevada Board of Governors.  However, I am submitting this on behalf of the Business Law Section itself and not on behalf of the State Bar of Nevada.  This has been approved unanimously by the Executive Committee, but it has not been submitted to the section members necessarily, as that has not been custom in prior legislatures.

I will go through the highlights of the bill.   As I went through a section-by-section discussion on the Senate side, I want to focus on some key areas for the sake of time.  Obviously if there are any specific questions, I am happy to answer any portion of the bill as may be identified.

A memorandum dated May 6, 2013, has been provided (Exhibit G) that should provide a high-level perspective as to what we are trying to do and what is in

Assembly Committee on Judiciary
May 6, 2013
Page 35

the content of this bill.  In the pages that follow, tracking the section numbers of <u>S.B. 441 (R1)</u> is a more precise summary as to the amendments made, the impetus for the amendments, and any necessary commentary to understand the amendments provided.  I would like to go through the bill and identify the key areas that I would like to create a record for so that it is properly understood.

In section 1, and at the prompting of certain footnotes in the Nevada Supreme Court's holding, *Consipio Holding, BV v. Carlberg*, 128 Nev. Adv. Op. 43, 282 P.3d 751 (2012), we thought it was appropriate to clarify the jurisdiction of courts in Nevada over officers and directors of Nevada entities such that there was a clear standard.  In that case, there were officers and directors who did not reside in the state that actually resided in Europe, and there was an issue as to whether the jurisdiction was properly held over those individuals.  We thought that balance was appropriate.   If someone is going to avail themselves of our laws, then they should also avail themselves of a process by which jurisdiction can be had over them in case there was a lawsuit.  What we have tried to do is take the lead from other states that have addressed this issue and adopted a framework by which jurisdiction can be had over such individuals.

Section 2 addresses changes of control.  We wanted to change the wording of *Nevada Revised Statutes* (NRS) 78.139 such that it was not written in a way that only covered changes of control that were brought to the attention of the board of directors, but that the standards of care and the presumptions of good faith apply to any and all changes of control that were either brought to the board of directors or initiated by the board of directors themselves.  This is a key distinction in Nevada versus those of other jurisdictions that afford the board of directors with at least a good faith presumption that they are doing what they need to do, informing themselves even in changes of control.

Moving on to sections 6 and 20, we wanted to pick up again on a footnote provided by the Nevada Supreme Court in the case of *Canarelli v. Dist. Ct.,* 127 Nev. Adv. Op. 72, 265 P.3d 673 (2011) where it was unclear as to what one would do for causes of action brought after an entity had dissolved themselves.  Our current statute provides a two-year time frame for causes of action brought prior to dissolution, but is silent as to claims post-dissolution.  What we tried to do in that instance was to look to see what other states have done, what the Model Business Corporation Act has done, and in that context identify that there is a ceiling or a stop-date as to when claims may be brought post-dissolution.  In that regard, we have proposed amendments that set forth a three-year statute of limitations.   The three years was an amendment made during the Senate work session that addresses certain concerns that were raised as to whether two years, which was the original proposal, was sufficient.

Assembly Committee on Judiciary
May 6, 2013
Page 36

This bill before you, as amended, provides for a three-year statute of limitations post-dissolution. We believe this addresses an area of the law that was unclear and provides greater clarity for the court.

The next areas I would like to address relate to limited liability companies in general. As you know, limited liability companies (LLCs) have become the entity of choice for a wide host of business ventures, being real estate related, joint venture, or even a sole proprietorship that wants to move to the next level. What we have tried to do is clarify some areas that are key aspects of business. The first area is called bankruptcy remoteness. This is a concept commonly used in a context of more traditional bank-driven financing whereby in exchange for the loan itself, a key term is that the entity cannot avail themselves of bankruptcy laws in the event there is a default in the payment terms. The basis for that is to preserve the revenues that are set forth in the loan agreement as they have been negotiated in good faith and by both sides and with the assistance of counsel.

There was some uncertainty as to whether Nevada entities were sufficiently bankruptcy remote vis-à-vis Delaware entities, so to speak, which is another common vehicle to be used in different financings. Although the Executive Committee believed that those features were equal and, in fact, potentially superior, we thought it was again necessary to emphasize that a Nevada LLC can be bankruptcy remote if the right provisions are provided for in the operating agreements.

As you will recall, there is a common misconception as to Nevada entities in general, so much of what we do is meant to merely emphasize the abilities and features that we currently have.

**Assemblyman Hansen:**
Having been involved in residential construction, one thing that has come up a lot ever since the economy collapsed was a lot of these parent corporations would form an LLC out of every single housing tract that they were involved with. Then they would basically bankrupt one LLC, and a bunch of subcontractors or people involved in those tracts would get burned by them. But they continued to function as other LLCs, and for the parent corporation there would seemingly be no way to get at their assets to make them pay the legitimate debts that they had incurred on the LLC that they bankrupted. Is there anything in this law that deals with that? I am not a lawyer, and some of this is clearly going over my head.

Assembly Committee on Judiciary
May 6, 2013
Page 37

**Robert Kim:**
The bankruptcy remoteness feature is designed to address the borrower/creditor relationship with respect to loan transactions.  I understand your situation and the context, and many times an important feature when agreeing to do work is to have multiple parties sign on behalf of the parent and subsidiary.  Obviously, it is troubling to the extent that good work is done without proper payment even though it was negotiated for in good faith at the onset as you described.  This particular provision does not address that per se.  It is meant to address situations where the parties that negotiated it cannot file bankruptcy.

**Assemblyman Hansen:**
I would love to talk with you sometime about that and see if we can make some resolutions in the future on that.  There were really ugly situations for these people.

**Patterson Cashill, representing the Nevada Justice Association:**
There is a large body of existing common law in the state of Nevada and statutory law that enables one who has a claim, for example, against an LLC in the example you have raised to pierce the veil of immunity that the LLC provides if the entity, or the LLC, has been used to perpetrate a fraud or to create an injustice.  Even though this particular bill does not address the issue with which you are concerned, other aspects of Nevada law do afford some measure of protection to creditors such as the one you have raised here.

**Assemblyman Hansen:**
Since it is not germane to this bill specifically, I would love to talk to you later about it.

**Chairman Frierson:**
Mr. Kim, you can continue your introductory remarks.

**Robert Kim:**
To follow on the points regarding LLCs, we also want to introduce in sections 15, 17, 18, and 19 the mandatory dissolution amendments that I just clarified to the extent to which an LLC is required to be dissolved or not.  There were some potential inconsistencies with respect to the fact that the statute demanded that the LLC must have a member, and that rubs against the potential bankruptcy remoteness aspects and also the successor aspects in terms of LLCs and the benefits of having to continue contractually for various reasons.  We felt that we should introduce provisions that bridge the potential ambiguity there.

Assembly Committee on Judiciary
May 6, 2013
Page 38

Lastly, the area of LLCs that we want to address is the timing of articles of dissolution. As currently written, the articles of dissolution are to be filed once a company has wound up and completed its affairs, which is in contrast to the corporate standard of allowing a company to file articles of dissolution and then continue as a corporate body for the purposes of winding up its affairs, such that the articles of dissolution are filed where further winding up of affairs were done prospectively. We just wanted to align the LLC statutes to be consistent with that of the corporate statutes.

The other aspect I would like to point out are sections 24 and 25, which actually allows a board of directors to affirmatively adopt on behalf of stockholders the right to dissent to certain corporate actions and events. Currently, the general rule is that if you are a public company, there is no right to dissent because the stock market allows for a sale of shares where you can exit the company at a fair market price, and if the dissenter's rights exist for nonpublic companies such that there is a merger transaction or other combination such that you believe you do not receive fair value for your shares, you can then initiate a process by which ultimately there could be a fair value hearing to determine what is the fair value for your shares. We thought that it was appropriate to allow a board of directors, if they believed it was in the best interest of the stockholders, to adopt those rights on behalf of the stockholders as soon as the circumstances permit themselves.

That would be the highlights of <u>S.B. 441 (R1)</u>. At this point, I am happy to entertain questions to any portion of the bill, or provide further summary if desired.

**Assemblywoman Spiegel:**
Under the right to dissent, what would happen if the way the dissent was put forth harmed the corporation?

**Robert Kim:**
Is your question to dissent that if the board of directors adopted the rights on behalf of stockholders in a manner that was ultimately harmful to the corporation?

**Assemblywoman Spiegel:**
As I read this—and I realize I may be getting into the weeds a little bit—it seems to me that this would also include corporations that were nonprofit corporations, including things like community associations where the shareholders are all people who own houses in those corporations, and if the board takes an action that is voted on and approved and there is a board

Assembly Committee on Judiciary
May 6, 2013
Page 39

member who dissents, and that dissent were put forth in a manner that would then harm the corporation, would there be some sort of remedy?

**Robert Kim:**
These amendments and the dissenter's rights statutes are designed to be for profit corporations, not for the nonprofit context. There is no value per se to the membership of a person in a nonprofit, if there is even a membership aspect. So it is meant to be in the context of for-profit corporations by board of directors that believe it is appropriate to engage those rights of the corporation.

**Assemblywoman Spiegel:**
If you look at page 5, line 17 of the bill, where it talks about what an entity is, the subsection 1 under that on line 18 includes a "Corporation, whether or not for profit."

**Robert Kim:**
The amendments to dissenter's rights are in NRS Chapter 92A, and in Chapter 92A there is a prefacing portion which has their own unique definitions that are applicable to that chapter with respect to entities. They relate to a corporation for profit; they relate to a limited liability company; they relate to a limited partnership and a business trust. They exclude entities such as general partnerships and other Nevada bodies that are not entities per se.

The definition of entity relates to a different set of amendments which I will identify for you in a moment.

**Assemblywoman Spiegel:**
When you say amendments, do you mean provisions of the bill?

**Robert Kim:**
Yes. To be more precise, provisions of the bill. In section 1, the purpose of defining "entity" was for the purposes of setting forth the proper foundation for personal jurisdiction over those that served as officers and directors of a Nevada entity as defined. And that was the purpose of the amendments on page 5, or the changes to the statute on page 5, lines 17 through 21.

**Assemblywoman Cohen:**
On page 3, line 29, it says, "The appointment of the registered agent is irrevocable." What is the purpose of that, and is it standard?

**Robert Kim:**
Again, this is in the context of trying to establish personal jurisdiction over nonresident officers and directors in Nevada such that they cannot evade

Assembly Committee on Judiciary
May 6, 2013
Page 40

personal jurisdiction by revoking or assigning a new registered agent.  That way there is a body through which a service can be provided such that it cannot be evaded by having a registered agent whose authority has been revoked to accept service of process.

**Chairman Frierson:**
The wording is confusing, going back and forth.  I think we get the point, but the way it is worded seems to say—such as in one section, it is saying that you have to always have a registered agent in the jurisdiction, and then this section it says it is irrevocable, which sounds like once you are the registered agent, you are stuck for life.  We want to make sure that it is clear, and I do not know if phrase making it irrevocable is something that is standard and that folks in the industry will understand.  At least we have a record that your intention is that there will always be a registered agent in the jurisdiction and if they change, they have to change consistent with the other section that requires it to be a local registered agent.

**Robert Kim:**
Right.  There is no intent to undermine that existing requirement at all.

**Assemblyman Wheeler:**
On page 11, section 7, line 17, it says, "for each subsequent filing of a certificate increasing authorized capital stock."  You went from $35,000 to $34,925.  I need to know why you did $75 less there.

**Robert Kim:**
This was a follow-on to an amendment that was adopted in either 2011 or 2009 and was made for Nevada for-profit corporations—NRS Chapter 80 is for foreign corporations.  As you can imagine, it is a very technical amendment because one already pays $75 just to file for the articles of incorporation or for qualification.  Given the maximum $35,000, it made sense to net out what you have already paid.  This number represents the additional amount you would have to pay if your capitalization was of a certain level that triggered the different higher amounts.

**Chairman Frierson:**
Are there any questions from the Committee?  [There were none.]  There are sections where, for example, on page 18, section 18, subsection 1, paragraph (e), it is setting the time limit at 180 days.  I think it is in another section as well.  In the absence of that provision, what is happening now?

Assembly Committee on Judiciary
May 6, 2013
Page 41

**Robert Kim:**
This is in the context of mandatory dissolution.  What we are trying to do is establish some clearer guidelines as to what happens when an LLC no longer has a member.  Although technically if an LLC was owned by an individual and that person passed away, his estate necessarily would succeed, there are provisions of operating agreements whereby the successor cannot be admitted as a member unless the other members approve.  They can succeed to the economic interests, but not necessarily as to any management-related powers.  It was not our intent to try to capture the ambiguity of the statute by going through this process.  We have come to a solution where we bring the resolution LLC to a clearer situation whether it is dissolution or otherwise by requiring during that window for those who have economic interest that the personal representative to actually continue the LLC or not.

**Chairman Frierson:**
Are there any other questions from the Committee?  [There were none.]  I will invite anyone who wishes to offer testimony in support of S.B. 441 (R1) to come forward now.

**Patterson Cashill:**
I would like to comment on one section, which is section 20 of the first reprint on page 20.  It has to do with the extension of the statute of limitations from two years to three years.  I would like to give a little bit of legislative history if I may provide it.  About 20 years or so ago, the state of California modified its one-year statute of limitations for general tort actions to two years because California found, during the legislative hearing process, that the shorter the statute of limitations, the more likely it was that lawsuits would be brought which would not have been brought had lawyers and clients had ample opportunity to investigate the underlying facts.

When Mr. Kim and I began to work on S.B. 441 (R1), he and I negotiated an extension of the statute of limitations to achieve that very purpose from two years to three years with certain nuances that are not relevant here because the amendment addresses my concerns and our association's concerns.  The point here is to give people ample opportunity, following the dissolution, to fully explore whatever claims anyone thinks they might have.  Launching the lawsuit, Mr. Chairman, as you well know, is subject to the provisions of *Nevada Rules of Civil Procedure* 11, which requires a lawyer to investigate the facts of the law behind the claims that are actually filed and subject to NRS 7.085, which is the vexatious litigation statute.  There are protections in place to sanction lawyers and their clients who bring meritless actions or vexatious litigation, which tend to ferret out one way or the other, lawsuits which ought not to have been brought.  The amendment to this statute

Assembly Committee on Judiciary
May 6, 2013
Page 42

of limitations in section 20 is for the very valid public purpose of giving people ample time to investigate the underlying facts so as to present meritorious claims and weed out those which perhaps ought not be brought.

**Chairman Frierson:**
Thank you for that clarification and making that record as an effort to provide more opportunity for attorneys to get together and talk so that we decrease the number of claims instead of being in a rush to get them filed.

**Scott W. Anderson, Deputy for Commercial Recordings, Office of the Secretary of State:**
We come in support of this bill.  We applaud the efforts of the Business Law Section and their efforts to improve Nevada's business law and continue to make Nevada a business-friendly state.  Any concerns that we had with the original bill were taken care of, and we support the bill.

**Chairman Frierson:**
Are there any questions from the Committee?  [There were none.]  Is there anyone else wishing to offer testimony in support?  [There was no one.] Is there anyone wishing to offer testimony in opposition?  [There was no one.] Is there anyone wishing to offer testimony in a neutral position?  [There was no one.]  I will close the hearing on S.B. 441 (R1).

There being no other items on the agenda and no previous business, is there anyone wishing to offer any public comment either in Carson City or Las Vegas? [There was no one.]  With nothing else to be discussed, today's Committee on Judiciary is now adjourned [at 10:43 a.m.].

RESPECTFULLY SUBMITTED:


_____
Linda Whimple
Committee Secretary

APPROVED BY:


_____
Assemblyman Jason Frierson, Chairman

DATE:  _____

Assembly Committee on Judiciary
May 6, 2013
Page 43

## **EXHIBITS**

**Committee Name:  Committee on Judiciary**

**Date:  May 6, 2013          Time of Meeting:  8:19 a.m.**

| Bill | Exhibit | Witness / Agency | Description |
|------|---------|------------------|-------------|
|  | A |  | Agenda |
|  | B |  | Attendance Roster |
| S.B. 286 (R1) | C | Marc Randazza | Testimony |
| S.B. 286 (R1) | D | James A. McGibney | Testimony |
| S.B. 421 (R1) | E | Stephanie Allen | Letter from Judge James T. Russell |
| S.B. 421 (R1) | F | Stephanie Allen | Proposed Amendment |
| S.B. 441 (R1) | G | Robert Kim | Memorandum |

## Exhibit F

https://twitter.com/Jones4Nevada/status/390168619486674944

