# EXHIBIT 6

Excerpts of the Deposition of

Dr. Thomas Parisi

*June 15, 2015*

```
 1              UNITED STATES DISTRICT COURT

 2               MIDDLE DISTRICT OF FLORIDA

 3                    TAMPA DIVISION

 4

 5   ROCA LABS, INC.,          )
                               )
 6            Plaintiff,       )
                               )
 7   vs.                       ) Case No.
                               ) 8:14-cv-2096-T-33EAJ
 8   CONSUMER OPINION CORP.    )
     and OPINION CORP. d/b/a   )
 9   PISSEDCONSUMER.COM,       )
                               )
10            Defendants.      )
     _____ )
11

12

13

14      VIDEOTAPED DEPOSITION OF THOMAS PARISI, M.D.

15                    VOLUME II

16        Taken on Monday, June 15, 2015

17                 At 7:05 p.m.

18        At 1160 North Town Center Drive

19                  Suite 300

20             Las Vegas, Nevada

21

22

23

24   REPORTED BY:  JO A. SCOTT, RPR, CCR NO. 669

25   REPORTED BY: GALE SALERNO, RMR, CCR No. 542
```

**CERTIFIED COPY**

```
 1    APPEARANCES:

 2    For the Plaintiff:

 3        CYNTHIA KOROLL, ESQ.
          Koroll Litigation Group
 4        630 N. Church Street
          Suite 202
 5        Rockford, Illinois 61103

 6
      For the Defendants:
 7
          MARC J. RANDAZZA, ESQ.
 8        Randazza Legal Group
          3625 South Town Center Drive
 9        Suite 150
          Las Vegas, Nevada 89135
10

11    For the Deponent:

12        CLYDE DeWITT, ESQ.
          Law Offices of Clyde DeWitt
13        2300 West Sahara Avenue
          Suite 800
14        Las Vegas, Nevada 89102

15    Also Present:
          JOSEPH CAMP, LEGAL VIDEOGRAPHER
16        PAUL BERGER, ESQ. (ROCA LABS, INC.)(TELEPHONICALLY)
          RACHEL HYMAN, ESQ.(ROCA LABS, INC.)(TELEPHONICALLY)
17
                          I N D E X
18
      WITNESS:                THOMAS PARISI, M.D.
19
      EXAMINATION                         PAGE
20
      BY MS. KOROLL                        13
21    BY MR. RANDAZZA                     253

22                  INDEX TO EXHIBITS

23    PLAINTIFF'S                         PAGE

24      13 - Declaration in Support of     94
              Defendants' Motion for Sanctions
25      14 - Customer Complaints          179
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1                    * * * * *
 2           THE VIDEOGRAPHER:  Good evening.  Today
 3    is Monday, June 15th, 2015.  This begins
 4    Volume II of the videotaped deposition of Thomas
 5    Parisi, M.D.  The time is approximately 7:05 p.m.
 6    We are located at the offices of All-American
 7    Court Reporters, 1160 Town Center Drive,
 8    Suite 300, Las Vegas, Nevada 89144.
 9           My name is Joseph Camp, court
10    videographer of Las Vegas Legal Video.  This is
11    Case Number A -- excuse me, 8:14-CV-2096-T-33EAJ,
12    in the United States District Court, Middle
13    District of Florida, Tampa Division, entitled Roca
14    Labs, Inc., plaintiff, versus Consumer Opinion
15    Corp. and Opinion Corp. doing business as
16    Pissedconsumer.Com, defendants.  This deposition
17    is requested by the attorneys for the plaintiff.
18           Would all counsel present, including
19    counsel over the phone, please identify yourselves
20    for the record?
21           MS. KOROLL:  Cynthia Koroll, independent
22    counsel for Roca Labs.
23           MR. RANDAZZA:  Marc Randazza.  I'm
24    counsel for the defendants.
25           MR. DeWITT:  Clyde DeWitt.  I'm counsel
```

1    for Dr. Parisi.

2              And I will add an issue --

3              MS. KOROLL:  I'm going to object, as was

4    stated before, to the presence of counsel and to

5    his interference with this deposition.

6              Counsel was hired when, during the last

7    deposition Mr. Randazza went to counsel's office

8    and sought counsel, hired him for this deponent,

9    and deponent did not select the counsel.  He's

10   hired by Mr. Randazza and being paid by him.

11             And we agreed to his presence here as

12   long as it does not disrupt the deposition in any

13   way, shape, or form.

14             MR. DeWITT:  I believe you also objected

15   on the grounds that I wasn't admitted in the

16   Middle District of Florida.

17             MS. KOROLL:  That would be correct.  Are

18   you?

19             MR. DeWITT:  No.  But I make the

20   observation of Rule 2.02(a) --

21             MS. KOROLL:  Same objection.  Move to

22   strike.

23             Sir, you are not admitted in the case.

24   There is no reason for you to make any citation of

25   law on the record.

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1    A.   Yes.

2    Q.   And are they still conferring degrees?

3    A.   Yes.

4    Q.   And what is your basis for that

5  knowledge?

6    A.   We visited there last year, and

7  everything would appear to be stable.

8    Q.   How long did it take you to complete your

9  training at the University of Sint Eustatius?

10    A.   Excuse me?

11    Q.   How long did it take for you to complete

12  your training?

13    A.   Six months.

14    Q.   So you went there for six months.  So my

15  understanding is you did a year at the American

16  University of the Caribbean, 18 months at

17  St. Christopher's, and six months --

18    A.   No, that's -- I'm sorry.  That's not

19  correct.  I mean, the whole thing added up to four

20  years, so it must have been -- St. Christopher's

21  must have been, I guess, 24 months, whatever it is

22  to add it up to four years total.

23    Q.   At which university did you begin

24  studying products known as galactomannans?

25    A.   Excuse me?

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1            MR. RANDAZZA:  Objection.
 2   BY MS. KOROLL:
 3       Q.   At which university did you study
 4   products known as galactomannans?
 5            MR. RANDAZZA:  Objection.  Assumes facts
 6   not in evidence.
 7            THE WITNESS:  Galac -- could you spell
 8   that, please?
 9   BY MS. KOROLL:
10       Q.   Yeah, g-a-l-a-c-t-o-m-a-n-n-a-n-s.
11       A.   I do not know what that is.
12            If your position is to ask me everything
13   that I was taught in medical school, I do not
14   remember everything that I was taught in medical
15   school.
16       Q.   Well, you would agree, sir, that you are,
17   in this case, seeking to provide opinions
18   regarding Roca's product, true?
19       A.   No, that's not true.  I had no idea that
20   this was a Roca product at all.  I was given a
21   list of ingredients, and that's it.  I had no idea
22   this had anything to do with Roca.
23       Q.   Okay.  Well, if we had your e-mails, we
24   certainly would have an ability to determine
25   exactly what you were asked to do, but we don't
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1    have those.  So it is your testimony that all you

2    were asked to do was that when you reviewed a

3    product, you did not know what the product was; is

4    that your testimony?

5        A.   Yes.  My knowledge was this was

6    potentially a weight loss product.  That's the

7    extent of what I knew about this.

8        Q.   Okay.  Potentially a weight loss product?

9        A.   Correct.

10       Q.   Who told you that this was potentially a

11   weight loss product?

12       A.   By reading the testimonies, that gave me

13   the -- an inkling that this was towards weight

14   loss.

15       Q.   What testimonies did you read?

16       A.   I cannot recall.  The ones that were

17   provided to me in the e-mail.

18       Q.   Who provided you with any testimonies?

19       A.   Testimony?  Testimonials.  I'm sorry.  I

20   meant to say testimonials, not testimonies.  I'm

21   sorry.

22       Q.   Who provided you with any testimonials?

23       A.   I believe Marc did.

24       Q.   And when you say I believe Marc did, how

25   did Marc provide you with any testimonials?

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1      Q.   Yes, sir.

 2      A.   No videos.

 3      Q.   Is it your testimony that at no time did

 4  you ever review a YouTube video published by Roca

 5  entitled Dr. Ross About Gastric Bypass No Surgery

 6  Side Effects backslash Complications?

 7      A.   I do not remember.

 8      Q.   You do not remember, or you did not

 9  review it?

10      A.   I do not think I've reviewed that, no.

11      Q.   Is it your testimony, sir, that at no

12  time you reviewed -- did you review a YouTube

13  video purportedly publish by Roca entitled What is

14  Gastric Bypass No Surgery by Roca Labs?

15          MR. RANDAZZA:  Objection.  Form.

16          THE WITNESS:  I'm sorry.  Repeat that.

17  BY MS. KOROLL:

18      Q.   Have you ever at any time viewed a

19  YouTube video purportedly published by Roca

20  entitled What is Gastric Bypass No Surgery by Roca

21  Labs?

22          MR. RANDAZZA:  Objection.

23          THE WITNESS:  I do not believe so, no.

24  BY MS. KOROLL:

25      Q.   What is the basis for your answer?
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1      A.    I believe I would remember watching a

2   video like that.

3      Q.    Why?

4      A.    I remember things.

5      Q.    At any time have you viewed a YouTube

6   video purportedly published by Roca entitled

7   Active Ingredients in the Roca Labs No Surgery

8   Gastric Bypass Formula?

9      A.    I do not believe so.

10     Q.    At any time have you viewed an article in

11  American Family Physician entitled Common Dietary

12  Supplements of Weight Loss?

13     A.    If that is listed in what I put in that

14  exhibit, then, yes.  I cannot recall the exact

15  magazine and article and titles.  I may have,

16  but --

17     Q.    How did -- if you viewed common dietary

18  supplements of weight loss, isn't it true that

19  that is an article provided to you by Marc

20  Randazza?

21     A.    No.

22     Q.    How did you obtain the article from --

23  entitled Common Dietary Supplements of Weight

24  Loss?

25     A.    All of my research was done through

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1  Medline, PubMed, or through Internet research.

2      Q.   All right.  Let's break that down.

3  Medline, how long have you had a Medline account?

4      A.   '92, possibly.

5      Q.   When did you --

6      A.   Actually -- well, Medline, it's not --

7  these aren't accounts.  These aren't -- you don't

8  pay for this.  This is a free service.  It's like

9  NIHCUC (phonetic) type stuff.  Anyone can go on

10 PubMed and Medline.  These aren't -- you don't

11 need log-ins or special stuff for this.

12     Q.   So it's your testimony that you performed

13 searches in this case on Medline, and that

14 searches in this case on Medline gave you free

15 articles to print, review, and utilize in this

16 case; is that your testimony?

17     A.   I'm sorry.  Repeat that.

18     Q.   Is it your testimony that you performed

19 research for this case on Medline, and that when

20 performing research for this case, you obtained

21 articles on Medline without having an account?

22     A.   Correct.

23     Q.   When did you perform the Medline search?

24     A.   I cannot recall.

25     Q.   What year?

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1   testify, charge a different rate in depositions and

 2   in court, correct?

 3        A.   Correct.

 4        Q.   So you never anticipated you would testify

 5   in court?

 6        A.   No.  It was a -- I believe it was sort of a

 7   coverall.  In other words, had it started to progress

 8   or had it progressed to something then --

 9        Q.   Did Mr. Randazza tell you that this matter

10   would never go to court?

11        A.   I cannot recall.

12        Q.   He may have, but you can't recall?

13        A.   He may have, yeah.

14        Q.   He may have?

15        A.   Don't recall.

16        Q.   When you signed the declaration in support

17   of defendant's motion for sanctions, did you

18   understand that this document would be filed in

19   court?

20        A.   Yes.

21        Q.   And you understood that it was a document

22   seeking sanctions against Roca Labs, Incorporated,

23   correct?

24        A.   I did not.  I thought it was against

25   Paul Berger.
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1      Q.   Look at the document.  Is there a caption

2   on it?

3      A.   I don't exactly know what you mean by

4   "caption."

5      Q.   Do the words "Roca Labs" appear on page one

6   of a document that you signed?

7      A.   Yes.

8      Q.   You did not know that this was a document

9   related to Roca Labs?

10      A.   No.

11      Q.   Let's talk a little bit about your

12   practice.  You run a vein clinic, correct?

13      A.   And an internal medicine clinic.

14      Q.   I understand you say you run an internal

15   medicine clinic.  How much of your practice is in

16   internal medicine versus veins?

17      A.   Vein work is about 50 percent.  Internal

18   medicine is about 35 to 40.

19      Q.   And your vein clinic has a website,

20   correct?

21      A.   Correct.

22      Q.   And your internal medicine clinic does not

23   have a website, true?

24      A.   True.

25      Q.   You advertise and hold yourself out as a

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1   specialist in the area of veins, correct?

2       A.   I am board certified by the American Board

3   of Venous and Lymphatic Medicine.  There's less than

4   285 of us in the entire country.

5            MS. KOROLL:  Objection.  Move to strike.

6   Unresponsive.

7            Madam Court Reporter, please read the

8   question back so the witness can answer the question

9   I asked.

10               (The record was read as requested.)

11           THE WITNESS:  Correct.

12  BY MS. KOROLL:

13      Q.   You're LinkedIn page indicates residents in

14  the Las Vegas area who seek treatment for varicose

15  veins, edema and other vascular dysfunctions

16  frequently turn to Dr. Thomas Parisi and Las Vegas

17  Vein, a clinic that focuses specifically on

18  rehabilitating the lower extremities.  True?

19      A.   True.

20      Q.   You do not have a LinkedIn page regarding

21  your internal medicine practice, true?

22      A.   Correct.

23      Q.   Your LinkedIn page asserts that you earned

24  your master's of science in microbiology from

25  Thomas Jefferson University, but that's not true?

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1        A.    The way the site is set up, you can't

2    really say that you can't complete that.  It doesn't

3    say there if you completed it or not completed it.

4        Q.    Sir, your LinkedIn site states he received

5    his bachelor's of science in biology at Widener

6    University, earned his master of science in

7    microbiology from Thomas Jefferson University in

8    type, correct?

9        A.    I do not know that.

10       Q.    That's false though, correct?

11       A.    That is true.

12       Q.    Your LinkedIn site says:  He attended the

13   University of St. Eustatius School of Medicine in the

14   Netherlands for his doctorate in medicine, correct?

15       A.    Correct.

16       Q.    Actually, you attended three schools for

17   your doctorate in medicine, correct?

18       A.    Correct.

19       Q.    UIS in the Netherlands was charted and

20   recognized on April 21st, 1999.  How does that

21   comport with the time that you attended?

22       A.    Excuse me, what are you saying?

23       Q.    How does that comport with the time that

24   you state you attended?

25       A.    What was the question?

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1    the Roca Labs product in the amounts in which it is

2    combined and sold on the internet?

3         A.    I do not.

4         Q.    Did you perform any experimentation using

5    any reliable principles and methods to assess the

6    Roca Labs product?

7         A.    No.

8         Q.    Do you have any on-the-job training in the

9    use of the Roca Labs product?

10        A.    No.

11        Q.    Do you hold yourself out to have extensive

12   experience, knowledge and skill on the Roca Labs

13   product in the manner in which it is -- the

14   ingredients are combined and sold to consumers?

15        A.    No.

16        Q.    Are there any specific professional studies

17   or personal experience that you have with the Roca

18   Labs product that allows you to provide scientific

19   reliable testimony as to how the product in the

20   dosages recommended on the website affects any one

21   individual patient?

22        A.    I'm going to need that repeated from the

23   court reporter.

24               (The record was read as requested.)

25               THE WITNESS:  No.

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1    BY MS. KOROLL:

2        Q.   Are your theories, as presented in this

3    case, a subject of peer review and publication?

4        A.   Yes.

5        Q.   Your personnel theories?

6        A.   Oh, I'm sorry, no.

7        Q.   Are your theories in this case a subject of

8    peer review and publication?

9        A.   I'm sorry, I was grabbing my soda.

10       Q.   I just asked the same question again.  I

11   wanted a clean answer.  So I'm going to ask you the

12   same question because I want a question and answer.

13           Are your theories in this case, have they

14   been subjected to peer review and publication?

15       A.   No.

16       Q.   Are your theories regarding the Roca Labs

17   ingredients generally accepted in the scientific

18   community?

19       A.   Yes.

20       Q.   Who are the members of the scientific

21   community that have espoused and accepted the

22   opinions that you offered in this case regarding Roca

23   Labs product?

24       A.   I'm sorry, repeat the question.

25           MS. KOROLL:  I'll have the court reporter

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1    read it back.

2                MR. RANDAZZA:  Objection.  Form.

3                     (The record was read as requested.)

4           THE WITNESS:  I would say the majority of

5    the medical community, because the documents I

6    provided cite captions from peer reviewed journals.

7    BY MS. KOROLL:

8       Q.   Sir, now, I asked you previously about your

9    opinions about Roca Labs products.  You told me you

10   didn't have an opinion about Roca Lab products, so

11   how is it possible that the scientific community has

12   espoused your opinions about Roca Labs products?

13      A.   Again, I wasn't assessing Roca Labs

14   product.

15      Q.   Then listen to this question.  I'm going to

16   have her read the question back.  Listen to the

17   question before you answer.

18                     (The record was read as requested.)

19           THE WITNESS:  None.

20   BY MS. KOROLL:

21      Q.   What is the known or potential rate of

22   error in any opinion that you have given in this

23   case?

24      A.   I'm sorry, repeat that.  What is my error?

25      Q.   What is the known or potential rate of

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

Page 160

1   error of the particular scientific technique you have

2   employed in assessing the Roca Labs products?

3        A.   That would be minimal, because everything I

4   did was referenced and cross-referenced.

5        Q.   Listen to the question.

6        A.   I said minimal.

7        Q.   Sir, you just told me you never assessed a

8   Roca Labs product.  I just asked you the known or

9   potential rate of error of the particular scientific

10  technique you used in analyzing the Roca Labs

11  products.

12       A.   I'm sorry, repeat that question again.

13       Q.   What is the known or potential rate of

14  error of the particular scientific technique you

15  employed in analyzing the Roca Labs product?

16       A.   What do you mean by "scientific technique"?

17       Q.   Did you use a particular scientific

18  technique in analyzing the Roca Labs product?

19       A.   No.

20       Q.   Therefore, you would agree that you do not

21  know the known or potential rate of error of any

22  particular scientific technique used to assess the

23  Roca Labs product, true?

24       A.   I don't know.

25            MS. KOROLL:  Shall I read more from Daubert

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1              And again, I have no opinion on this.  No

2    matter what the product could do, the way this reads

3    is that they are held harmless of anything.  And it's

4    like, well, if it's just cut and dried held harmless,

5    then, yeah, I consider that to be unethical and

6    immoral.

7              Now, if Roca is willing to talk to the

8    person, interact with them, see what's going on,

9    coordinate it with their primary care -- I'm talking

10   about these gray areas -- if Roca is doing that

11   stuff, then they're not immoral and unethical.

12             But if they're just saying here's your

13   money and then you're on your way regardless of what

14   happens to you, I consider that immoral and

15   unethical.

16        Q.    Define immoral in the context that you use

17   it when you state that it is immoral for Roca to

18   attempt to absolve itself from liability for harm?

19   Define immoral.

20        A.    I think I just explained it.  I felt as if

21   I did.

22        Q.    Define the word "immoral".

23        A.    Immoral?  Not adhering to the standards of

24   society, I guess.  That's my definition.

25        Q.    You guess?

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1        A.    I'm not -- I don't have -- I'm not a
 2   dictionary.  I don't know.
 3        Q.    Sir, when you signed a statement under
 4   penalty of perjury and you used the word "immoral,"
 5   were you using it in the context of Roca is immoral
 6   because they're not adhering to the standards of
 7   society?
 8        A.    Standards to the safety of their product.
 9        Q.    So Roca being immoral is not adhering to
10   the standards of society to the safety of their
11   product?
12        A.    Look, I've been up since 7:00 a.m.  I am
13   exhausted right now.  If I'm being nonsensical, it is
14   because I am exhausted.  So I'm going to try to
15   explain it to you the best I can.
16        Q.    Sir, I'm going to be playing this video to
17   a jury.
18        A.    That's fine by me.
19        Q.    So what I need for you to do is, you've
20   given a disclosure under penalty of perjury.  It's
21   been provided to me.  It's been filed in this case.
22   I need you to define the term immoral --
23            MR. RANDAZZA:  Objection.  Harassing.
24   BY MS. KOROLL:
25        Q.    And I need you to be clear about it.
```

```
 1              THE WITNESS:  I don't know the exact
 2   definition of immoral.
 3   BY MS. KOROLL:
 4        Q.   When you utilized it in your declaration --
 5              MR. RANDAZZA:  Objection.  You're harassing
 6   the witness.
 7   BY MS. KOROLL:
 8        Q.   When you utilized --
 9              MR. RANDAZZA:  Objection.  Harassing.
10              THE WITNESS:  I felt it was not right.  It
11   is not right that if you put out a product, that you
12   do not support it.  That's what I mean.
13   BY MS. KOROLL:
14        Q.   And that's immoral?
15        A.   I consider that to be immoral.
16        Q.   So to put out a product and not support it,
17   by not having people that -- that the user could call
18   for questions, not having a person that the user
19   could e-mail and interact with, and not having
20   information to send to the user, if Roca didn't do
21   any of those things, it would be immoral in its
22   actions?
23        A.   With my definition, I would feel that would
24   be immoral.
25        Q.   And if Roca had support for every consumer
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1  fibromyalgia from an injury?

2      A.   Well, fibromyalgia is a diagnosis of

3  exclusion.  So we are actually not aware of its

4  etiology.  So at this point in time, it is within the

5  differential.

6      Q.   Are you offering an opinion within a

7  reasonable degree of certainty that this person got

8  fibromyalgia from an injury?

9      A.   Yes.

10      Q.   And when did they develop fibromyalgia?

11  What was the date?

12      A.   When they were in college.

13      Q.   And where were they diagnosed?  What state?

14      A.   I don't know.

15      Q.   What country?

16      A.   United States.

17      Q.   And what is your basis for stating that?

18      A.   Because he's a member of the Knights of

19  Columbus.

20      Q.   Is it your testimony, sir, that the Knights

21  of Columbus are only a United States organization?

22      A.   I believe so.

23      Q.   And so you believe that he got diagnosed in

24  the United States because he was a member of the

25  Knights of Columbus?

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

 1      A.   No.

 2      Q.   In reviewing this document, it is your

 3 testimony that this reviewer has been diagnosed with

 4 a condition of irritable bowel syndrome?

 5      A.   Yeah.  Well, there's a fair amount of

 6 people who with fibromyalgia do have irritable bowel.

 7 They seem to go hand in hand.

 8      Q.   That's not my question.

 9      A.   What is your question?

10      Q.   My question is:  Is it your opinion, based

11 on this review alone, are you able to offer an

12 opinion to provide in front of a jury stating that

13 this person who posted this review was diagnosed by

14 a physician with a condition of irritable bowel

15 syndrome?

16      A.   No.

17      Q.   Why not?

18      A.   Because it doesn't say it.  This was my

19 opinion.

20      Q.   I understand that.  Is it your testimony

21 that the use of the Roca Labs product in this patient

22 created a condition of irritable bowel syndrome?

23      A.   I feel it may have been a variable.

24      Q.   That's not my question.

25      A.   That's my answer.

1      Q.   My question is, and listen to the question

2  because this is the standard in which medical

3  testimony is evaluated.

4           Are you able to offer your opinion within

5  a reasonable degree of certainty based on your

6  background, training and experience that the

7  ingestion of Roca Labs product in this reviewer

8  caused the condition of irritable bowel syndrome?

9      A.   No.

10     Q.   Let's look at the seventh complaint.

11          Now, if we look at the top of the page, and

12  what do you have as the number at the bottom

13  right-hand corner?

14     A.   03666.

15     Q.   Did you review the review by Jennifer?

16     A.   Yes.

17     Q.   And Jennifer complained because after she

18  lost 20 pounds in the first month, lost 20 pounds in

19  the second month, and lost 10 pounds in the third

20  month, and 4 pounds in her -- I'm sorry, and 10

21  pounds in the fourth month, her weight loss stopped,

22  correct?

23     A.   Correct.

24     Q.   So she lost 60 pounds, correct?

25     A.   Yes.

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1   of Konjac in the product, do you believe that that

2   one teaspoon would cause ulcers in the user?

3        A.   I don't know.

4             MR. RANDAZZA:   Asked and answered.

5   BY MS. KOROLL:

6        Q.   If there was one teaspoon of the product

7   Konjac in the product, do you believe that that

8   teaspoon would cause gastrointestinal issues for the

9   user?

10       A.   Potentially.

11       Q.   Are you offering an opinion within a

12  reasonable degree of certainty based on your

13  background, training and experience that one teaspoon

14  of Konjac in the Roca Labs product will create

15  gastrointestinal issues for every user?

16       A.   Potentially.

17       Q.   The question is within a reasonable degree

18  of certainty, sir.

19            MR. RANDAZZA:   Asked and answered.

20            THE WITNESS:   I don't know an exact number.

21  BY MS. KOROLL:

22       Q.   So when you say "potentially," I'm asking

23  you are you able to offer an opinion within a

24  reasonable degree of certainty that each and every

25  user of the Roca Labs product that ingests one

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1   teaspoon of Konjac will suffer from what you describe

2   as a gastrointestinal issue?

3        A.   The amount doesn't matter.  What matters is

4   how the chemical works.  So you could take a

5   teaspoon, you could take a gallon, you could just

6   have a drop put on your tongue.  Depending on how

7   that reacts with you, you could have gastrointestinal

8   issues.

9            I mean, the way that this works is by

10  working through the GI system, increasing the butyric

11  acid, and causing increased peristalsis in the GI

12  system.

13           So I mean, it could be a drop, it could be

14  a teaspoon, it may take a gallon.  Who knows?  There

15  could be such an amount that you could never get an

16  illness.  Well, what's my degree of certainty of one

17  teaspoon?  Well, any amount that you say could

18  potentially cause GI distress.  I don't know an exact

19  amount.

20           MS. KOROLL:  Objection.  Move to strike.

21  Unresponsive.

22           Madam Reporter, read the question I asked

23  back.

24           MR. RANDAZZA:  Objection.  You're harassing

25  him.  Every time he gives an answer you don't like,

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1    you object and move to strike his answer.

2              MS. KOROLL:  Your comments are

3    inappropriate, sir.

4              MR. RANDAZZA:  Call the police, then.

5                   (The record was read as requested.)

6              THE WITNESS:  One more time.

7                   (The record was read as requested.)

8              THE WITNESS:  I cannot.

9                   (Exhibit 3 was identified.)

10   BY MS. KOROLL:

11       Q.   I'm showing you what I have marked as your

12   Deposition Exhibit 3.  It's been previously provided

13   to you.

14              Counsel?

15              MR. DeWITT:  Is that the one?

16              MS. KOROLL:  Yeah, that's the one you were

17   trying to show him before.

18              MR. DeWITT:  Well, he was trying to look at

19   it.  I wasn't trying to show it to him.

20   BY MS. KOROLL:

21       Q.   Let me know when you're finished reading.

22              MR. DeWITT:  Say that again?

23              MS. KOROLL:  I told him to let me know when

24   he's finished reading the exhibit.

25              MR. DeWITT:  Okay.

1    that is strongly -- there's a lot of evidence that

2    supports it.  Grade II-C is basically evidence that

3    is absolutely the furthest part of the spectrum.

4    It's basically word of mouth or whatever people are

5    saying.

6            So you're going from double -- you're going

7    to randomize double-controlled blind studies that

8    give you the Grade I-A evidence, and then you have

9    things that are II-C evidence, which could be

10   antidotal, if I'm using that word correctly.

11       Q.   All right.  So let's look at your reference

12   to guar gum.

13           Please tell -- you did not put in your

14   letter the evidence grade of this article, correct?

15       A.   Not for guar gum, no.

16               (Mr. Randazza left the room.)

17   BY MS. KOROLL:

18       Q.   What is the evidence grading of the Saper,

19   S-a-p-e-r, article?

20       A.   Well, like I said, I put a reference for an

21   evidence grade.  So in this article, again, this is

22   the American Family Physicians.  So this is a

23   peer-reviewed journal that is authored by the

24   American Family Physicians.  Therefore, it is felt to

25   be legitimate and, therefore, in this article, what

1    was stated was guar gum was ineffective for weight

2    loss, and you should be discouraged.  That was the

3    finding.

4              MS. KOROLL:  Objection.  Move to strike.

5    Unresponsive.

6              Please read my question back.

7              Doctor, listen to my question and answer my

8    question.

9              And Mr. Randazza is out of the room again.

10             (Mr. Randazza returned.)

11             (The record was read as requested.)

12             THE WITNESS:  I do not know.

13   BY MS. KOROLL:

14        Q.   You have an article regarding Inulin.  What

15   is -- you would agree you did not list an evidence

16   grade for the Inulin article, true?

17        A.   Yes.

18        Q.   And this grading scale of evidence grade,

19   whose scale is this?

20        A.   This is a national scale.  I can't give

21   you -- I can't tell you the exact body right now

22   because I'm exhausted.  But this is well known in

23   literature and medical science.  Anyone can go

24   on-line and look up scientific research and see about

25   evidence grades.

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1        Q.    So what is the evidence grade of the ran

2    article?

3        A.    Well, again, this is basically a biology

4    meeting is what this is.  So this evidence is I-A.

5    It's absolutely I-A.

6        Q.    And so the evidence that is I-A, you got

7    a -- you received -- reviewed an article on how to

8    assess glomerular function and damage in humans,

9    correct?

10        A.    Right.

11        Q.    And what other articles did you research

12    regarding -- that reported on the positive properties

13    of Inulin such as the ones that you already testified

14    to?

15        A.    Articles I have read throughout time.

16        Q.    So there are positive articles on Inulin?

17        A.    Absolutely.  Absolutely.

18        Q.    And then the --

19        A.    Again, to reflect on that point, I was

20    assessing Inulin, not Inulin fiber.  So I just really

21    want to make that clear that this was about Inulin.

22    This was not about Inulin fiber, because the other

23    term wasn't exact to me.

24        Q.    Why didn't you go to Mr. Randazza and ask

25    him for clarification of the term?

Thomas Parisi, M.D. · Vol. II · June 15, 2015
* * *Videotaped Deposition* * *

1   redirect?

2          MR. DeWITT:  I won't say anything, he won't

3   say anything, unless he has a quick objection.

4          MS. KOROLL:  No redirect?  I'm done in

5   20 minutes and we're done?

6          MR. RANDAZZA:  No, you're done in

7   20 minutes.  I get a chance to redirect him.

8          MS. KOROLL:  So how long is that going to

9   take?

10          MR. RANDAZZA:  If you'll shut up, I can do

11   it in less than a half an hour.

12          MS. KOROLL:  Did you just tell me to shut

13   up?

14          MR. RANDAZZA:  No, I said, hypothetically,

15   if you will shut up, I can do it in a half hour.

16          MS. KOROLL:  I believe you said, "if you'll

17   shut up."

18          MR. RANDAZZA:  Yes, that's exactly what I

19   said, "if you'll shut up."

20          MR. DeWITT:  So if he does 20 minutes and

21   you do a half an hour --

22          THE WITNESS:  Come on.

23          MR. DeWITT:  -- that's --

24          MS. KOROLL:  And then I would get to

25   question again after he's done.

```
 1              MR. DeWITT:  25 minutes --
 2              MR. RANDAZZA:  Let's adjourn this to a
 3    civilized hour, like we should.
 4              MS. KOROLL:  I stayed two extra days to
 5    accommodate your witness, who was ill.  I offered all
 6    day Saturday, all day Sunday, all day Monday.
 7              MR. RANDAZZA:  Well, tomorrow is another
 8    day.
 9              MS. KOROLL:  He selected the 7:00 p.m.
10    time.  I have a flight in the morning.  I'm not
11    staying.  This will be done.
12              MR. RANDAZZA:  Well, then we can do it
13    telephonically.
14              MS. KOROLL:  I'm not doing it
15    telephonically.
16              MR. RANDAZZA:  Will you look at the guy?  I
17    mean, this isn't Guantanamo Bay.  It's 1:00 o'clock
18    in the morning.
19              MR. DeWITT:  How long do you think --
20              MR. RANDAZZA:  I mean, seriously --
21              THE WITNESS:  If we're going to be here for
22    another hour or so, come on.  What the hell is going
23    on here?  Let's go.
24              I'm starting to get pissed is what I'm
25    doing.  It's 1:00 in the morning.  I'm exhausted.  I
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1   don't even know what I'm saying.

2          MR. DeWITT:  That's my --

3          MR. RANDAZZA:  His testimony is unreliable.

4          THE WITNESS:  I don't know what's going on

5   right now.

6          MR. DeWITT:  Do you think --

7          THE WITNESS:  We've already gone through

8   this whole thing.

9          MR. DeWITT:  Do you think you're having

10  problems giving accurate answers?  That's the

11  question.  Because --

12         THE WITNESS:  I'm not coming back and doing

13  this.

14         MR. RANDAZZA:  We can do it telephonically.

15  We can do it by Skype.  We can reconvene at a normal

16  time after --

17         MS. KOROLL:  No, we're not reconvening

18  this.

19         MR. RANDAZZA:  We can do that.

20         MR. DeWITT:  Well, I thought you said the

21  deposition was still be open because you don't have

22  exhibits that Mr. Randazza has.

23         MS. KOROLL:  I have to ask the Court for

24  time to come back on that.  I'm not -- the Court may

25  say no.  So I'm not taking the risk.  I would like to

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1    finish asking questions.

2           MR. RANDAZZA:  What do you need from the

3    Court?  Maybe I'll stipulate to it.

4           MS. KOROLL:  You could have brought the

5    e-mails.

6           MR. RANDAZZA:  What e-mails do you want?

7           MS. KOROLL:  Every e-mail exchanged with

8    this expert at any time ever.

9           MR. RANDAZZA:  Well, I'm not giving you my

10   work product.

11          MS. KOROLL:  It's not your work product.

12          MR. RANDAZZA:  Sure it is.

13          MS. KOROLL:  It's not work product when it

14   goes to the expert.

15          MR. RANDAZZA:  Well, you're not sending a

16   subpoena to my files.  You can subpoena him.

17          MS. KOROLL:  I did subpoena him.  He didn't

18   bring them.

19          MR. RANDAZZA:  Well, I'm sorry.  What do

20   you want me to do?  Do you want me to torture him?

21          THE WITNESS:  I don't have them.

22          MS. KOROLL:  I would like to finish

23   questioning.

24          MR. RANDAZZA:  Well, I think it's

25   ridiculous, and I think everything that comes out of

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

Page 249

1   his mouth after this point, given how he's expressed

2   how he's feeling, is completely unreliable.

3          MS. KOROLL:  He elected this time.

4          MR. RANDAZZA:  Okay, well, you know what, I

5   would not be testifying under oath if I were in those

6   conditions, and I don't think anything he has to say

7   should be deemed reliable.

8          MR. DeWITT:  Just do your 20 minutes, okay?

9   BY MS. KOROLL:

10      Q.   Doctor, I would like you to look at the

11   paragraph on the bottom of page 1.  Are these your

12   assigned tasks and materials reviewed?

13      A.   Yes, it looks like.

14      Q.   How was this document created?  Did you

15   write it?

16      A.   I did not write this.

17      Q.   Who wrote it?

18      A.   I do not know.

19      Q.   How was it presented to you?

20      A.   I cannot recall.

21      Q.   Did you read it before you swore under

22   penalty of perjury that it was true?

23      A.   I provided all the information, and I

24   assumed that everything in here was accurate.

25      Q.   That's not my question.  My question is --

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1          A.    I answered your question.

2          Q.    No.  My question is, sir, did you read it

3     before swearing under penalty of perjury that it was

4     true?

5          A.    I did not read every little line on all of

6     this because I don't understand what a lot of this

7     says.

8          Q.    Tell me, let's start with page 1, and tell

9     me what you don't understand.

10          THE COURT REPORTER:  I didn't understand

11     you.

12          THE WITNESS:  I was mumbling because I'm

13     trying to figure out what's -- I mean, I reviewed

14     this stuff.  Went to the website.  I can't remember

15     if I saw the videos.  I definitely provided these

16     articles.  This is stuff that I did, page 3.

17     BY MS. KOROLL:

18          Q.    The question is, sir, you just indicated

19     that you did not read every line before signing it

20     under penalty of perjury.  And you indicated that you

21     did not do it because you don't understand certain

22     things.

23          So what I want you to do is tell me what

24     things you don't understand in your sworn statement.

25          MR. RANDAZZA:  Objection.  Harassing the

1   witness.  And clearly he's not capable of giving a

2   deposition at this point.

3            THE WITNESS:  This is the same thing I just

4   did right there.  That's this.

5   BY MS. KOROLL:

6       Q.   No, Doctor, Exhibit 3 is not the same as

7   the exhibit with your declaration.  Number one, the

8   difference is this is sworn.  Number two, there is a

9   listing of many items that did not include in

10  Exhibit 3.

11           So between the time you wrote Exhibit 3 and

12  the time you wrote your declaration, did you have

13  another session of time in which you reviewed certain

14  documents?

15      A.   I cannot recall.

16      Q.   So did Mr. Randazza's office just put these

17  citations in for you and ask you to sign them?

18      A.   A lot of this information I did not write.

19      Q.   Okay.  So if you didn't write it, then

20  Mr. Randazza's office wrote it, correct?

21      A.   I don't know.

22      Q.   Well, here's the choices:  Obviously, the

23  people that had anything to do with creating this

24  document were either you or Mr. Randazza's office.

25  If you didn't write it, who did?

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1          MR. DeWITT:  Objection.  Speculation.
 2          THE WITNESS:  I don't know who wrote this.
 3  BY MS. KOROLL:
 4      Q.   Sir, it was provided to you.  When it was
 5  provided to you, was it explained to you that this
 6  was your declaration and you're signing it under
 7  penalty of perjury?
 8      A.   What I was signing -- well, what I thought
 9  I was signing was just basically everything that I
10  had said right there, just legal terms.
11      Q.   So it is your testimony, sir, that you were
12  advised that the declaration would contain only the
13  items in Exhibit 3 and nothing else, correct?
14      A.   Correct.
15      Q.   And so all of your opinions in this case
16  are contained -- if they are not in Exhibit 3, they
17  are not your opinions, true?
18      A.   Yes.  Which one is Exhibit 3?
19      Q.   Right there in your hand.  And that is
20  the --
21      A.   This one right here?
22      Q.   Let's make sure you get the right one.  I
23  want you to look at Exhibit 3, and Exhibit 3 is a
24  three-page letter you authored, correct?
25      A.   Yes.  This is.
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1        Q.   So Exhibit 3 is your opinions in this case,
 2   correct?
 3        A.   Right.  My understanding is that Exhibit 3
 4   was just put into a legal document right here, and
 5   basically this is just a legal document.  That was my
 6   understanding.
 7        Q.   Now, you say "just this," you're referring
 8   to Exhibit 8, correct?
 9        A.   Yes.
10        Q.   All right.  So you would agree that if the
11   information is not in Exhibit 3, it is not your
12   opinion in this case, true?
13        A.   True.
14             MS. KOROLL:  I'm finished.  Thank you.
15
16                       EXAMINATION
17   BY MR. RANDAZZA:
18        Q.   Dr. Parisi, take a look at Exhibit 1, your
19   declaration.
20        A.   Okay.
21             MS. KOROLL:  Exhibit 8.
22             MR. RANDAZZA:  Exhibit 8.
23   BY MR. RANDAZZA:
24        Q.   Do you need a break before we continue?
25        A.   No, I'm all set.  The adrenalin is going
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

```
 1   now.  I can stay up all night now.  Seriously, I can
 2   stay up all night.
 3           MR. DeWITT:  Do you want water or coffee or
 4   anything?
 5           THE WITNESS:  No.
 6           MS. KOROLL:  No, let's go.
 7   BY MR. RANDAZZA:
 8       Q.   Do I understand correctly that you just
 9   testified that this declaration is not your sworn
10   testimony anymore?
11       A.   There are parts in here that are true, and
12   there are some parts that I cannot recall if I put
13   this stuff in here.  But some of this is stuff that I
14   don't remember saying to anyone.
15       Q.   When did you sign this declaration?
16       A.   September 18, 2014.
17       Q.   So is it that you don't remember --
18       A.   September 18th.
19       Q.   So you don't remember writing it, or you
20   deny writing it?
21           MS. KOROLL:  Objection.  Compound.  Form.
22   Asked and answered.
23           THE WITNESS:  Most of this looks like it
24   refers to this.  Some stuff that --
25
```

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1   BY MR. RANDAZZA:

2        Q.   It's okay if you deny writing it.

3             MS. KOROLL:  Objection.  That's an improper

4   statement.  It's not a question.  It's a statement

5   designed to coach the witness to provide an answer.

6             MR. RANDAZZA:  Do you think that's the

7   answer I want out of him?

8             THE WITNESS:  I did not author this.

9             MR. RANDAZZA:  Okay.  Then I'm done.

10            MS. KOROLL:  So I'm going to have the

11   exhibits, I will leave with the court reporter.

12            And Counsel, perhaps you have some

13   commentary on this, but in Illinois and under the

14   Federal Rules of Civil Procedure Northern District, I

15   would give the witness an opportunity to review the

16   transcript only for the accuracy of the court

17   recorder, but I'm uncertain as to whether he has that

18   right or not?

19            MR. DeWITT:  In the jurisdictions I'm

20   familiar with, which are Nevada and California, the

21   witness can review the transcript and make any

22   corrections he or she wants.  But if it's a

23   correction of substance, changing "no" to "yes" or

24   something like that, that can be commented on.

25            MS. KOROLL:  So this is what I'm going to

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

1   state:  I believe, sir, that you may have a right to

2   review the transcript for the purposes of the

3   accuracy of the court reporter, or you may waive that

4   right.

5            If you're entitled to that right, would you

6   like to review it or would you waive?

7            MR. DeWITT:  Don't waive it.

8            THE WITNESS:  I would like to review it.

9            MR. DeWITT:  And we can come to blows if

10  necessary to --

11           MS. KOROLL:  Deal with it.

12           Okay.  Off the record.

13           THE VIDEOGRAPHER:  This concludes Volume II

14  of the videotaped deposition of Thomas Parisi, M.D.

15  The original media of today's testimony will remain

16  in the custody of Las Vegas Legal Video.

17           The time is approximately 1:05 a.m.  We are

18  going off the record.

19                    -    -    -

20                (The videotaped deposition was

21                concluded at 1:05 a.m.)

22                    -    -    -

23

24

25

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

Page 257

```
 1                    CERTIFICATE OF DEPONENT

 2    PAGE      LINE       CHANGE                    REASON

 3    _____

 4    _____

 5    _____

 6    _____

 7    _____

 8    _____

 9    _____

10    _____

11    _____

12    _____

13                        * * * * *
          I, THOMAS PARISI, M.D., deponent herein, do
14    hereby certify and declare under penalty of perjury
      the within and foregoing transcription to be my
15    deposition in said action; that I have read,
      corrected and do hereby affix my signature to said
16    deposition.

17

                              _____
18                            THOMAS PARISI, M.D.

19

20
          Subscribed to and sworn before me this _____
21

22     day of _____, _____.

23

24
                              _____
25                            Notary Public
```

All-American Court Reporters (702) 240-4393
www.aacrlv.com

Thomas Parisi, M.D. - Vol. II - June 15, 2015
* * *Videotaped Deposition* * *

Page 258

1              CERTIFICATE OF REPORTER

2         I, the undersigned, a Certified Shorthand

3    Reporter of the State of Nevada, do hereby certify:

4         That the foregoing proceedings were taken

5    before me at the time and place herein set forth;

6    that any witnesses in the foregoing proceedings,

7    prior to testifying, were duly sworn; that a record

8    of the proceedings was made by me using machine

9    shorthand which was thereafter transcribed under my

10   direction; that the foregoing transcript is a true

11   record of the testimony given to the best of my

12   ability.

13        Further, that before completion of the

14   proceedings, review of the transcript [ x ] was

15   [  ] was not requested pursuant to NRCP 30(e).

16        I further certify I am neither financially

17   interested in the action, nor a relative or employee

18   of any attorney or party to this action.

19        IN WITNESS WHEREOF, I have this date

20   subscribed my name. Dated: June 22, 2015.

21

22   _____
     JO A. SCOTT, RPR, CCR NO. 669

23

24   _____
     GALE SALERNO, RMR, CCR No. 542

25

All-American Court Reporters (702) 240-4393
www.aacrlv.com